# BURDON CENTRAL SUGAR REFINING COMPANY *v.* PAYNE.

## CERTIFICATE FROM THE COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 722. Submitted April 12, 1897. — Decided May 10, 1897.

P. and P., owners of three sugar plantations in Louisiana, leased the sugar-house on one of them with all its machinery, and such defined land in that plantation as might be found necessary for its use, to F. and F. for a term of years. The lessees agreed to buy during the term, and the lessors agreed to sell and deliver to them during that time, the sugar-cane grown on the three plantations. Elaborate provisions were made respecting the conduct of the business, and the manner of fixing from time to time the price of the cane. The thirteenth article was as follows: "The price of cane as above determined shall be paid as follows: Two and $\frac{75}{100}$ dollars per ton shall be paid every Monday, for the cane delivered during

the preceding week, until the delivery is completed. The balance, if any, per ton, shall operate as a lien and privilege to the full extent of such balance on the first bounty money received by the parties of the second part on sugar produced from cane ground at the Barbreck sugar-house, and the said parties of the second part covenant and agree to consecrate solely to the payment of such balance all bounty payments so received by them, until the whole of the said balance shall have been paid." The twentieth article was as follows: "The parties of the first part agree to keep all such books and records as are required by the United States Government in relation to the bounty, and to furnish to the parties of the second part all the details which may be necessary to enable them to effectuate their bounty rights." The lessees, with the consent of the lessors, transferred their rights and their interests under the lease to a corporation which assumed their obligations thereunder. This corporation became involved and a receiver was appointed in an equity suit brought by the Burdon Company. The lessors intervened in this suit, claiming that their claim for the balance due on the purchase price, and also their claim for cane delivered to the lessees were secured by a lessor's privilege, under Louisiana law, on the property of the lessees at the sugar-house, and the latter also by an equitable lien on any bounty that might thereafter be collected by the receiver. The Circuit Court decided that the intervenors were entitled to the lessor's privilege, and to an equitable lien on the bounty. An appeal having been taken from this decision, the Circuit Court of Appeals certified the facts to this court and propounded the following questions: "*First.* It being shown that the cane sold by appellees, J. U. Payne & Company et als., to the Ferris Sugar Manufacturing Company, Limited, pursuant to the contract between the parties, was grown on lands not embraced within the limits of the premises leased to the Ferris Sugar Manufacturing Company, Limited, are appellees, under the laws of Louisiana, considered in connection with the provisions of the contract, entitled to the lessor's privilege to secure the payment of the purchase price of such cane? *Second.* Under the terms of the thirteenth article of the contract between the Paynes and the Ferrises, and to secure the payment of the price of the sugar-cane sold and delivered under said contract, have the appellees H. M. Payne, J. U. Payne and the members of the firm of J. U. Payne & Company, an equitable lien upon the bounty money collected from the United States by the receiver in this suit? *Third.* If the second question shall be answered in the affirmative, can such equitable lien, under the laws of Louisiana, be so enforced in the present suit as to appropriate the bounty money to the payment of the claim of the Paynes, to the exclusion of the general creditors of the Ferris Sugar Manufacturing Company?" To these several questions the court now make answer as follows:

(1) The first question is answered in the negative;

(2) The second question is answered in the affirmative;

(3) The third question is answered in the affirmative.

THE Circuit Court of Appeals for the Fifth Circuit, desiring the instruction of this court for the proper decision of certain questions arising in the above entitled cause, certified the statement of facts set out in full in the margin,[1] and thereon propounded the following questions:

---

[1] "1. H. M. Payne, J. U. Payne and J. U. Payne & Company, a commercial firm composed of J. U. Payne, J. U. Payne, Jr. and R. W. Foster, all residents of New Orleans, La., were the owners of three contiguous plantations in St. Landry Parish, Louisiana, known as Barbreck, St. Peter's and Anchorage.

"2. On June 16, 1892, they entered into the following contract with L. Murray Ferris and Wm. L. Ferris, of Poughkeepsie, New York, which was duly recorded:

"This indenture made by H. M. Payne, J. U. Payne and the firm of J. U. Payne & Co., all residents of the city of New Orleans, State of Louisiana, as the parties of the first part, and L. Murray Ferris and William L. Ferris, both residents of the city of Poughkeepsie, State of New York, as the parties of the second part, witnesseth: That whereas the said H. M. Payne, J. U. Payne and the firm of J. U. Payne & Co., parties of the first part, as aforesaid, are the owners and proprietors of three certain plantations, to wit: the Barbreck, St. Peter's and Anchorage places, their respective interest in the said three plantations being of record in the said parish, and

"Whereas, the said L. Murray Ferris and William L. Ferris, parties of the second part, as aforesaid, have proposed to contract, upon the terms and conditions hereinafter provided, for a lease of the Barbreck sugar-house, and the purchase of the crops of the three aforesaid plantations:

"Now, therefore, the said parties of the first part, each for and as regards his respective interest in the said plantations, and the said parties of the second part jointly and severally, hereby contract, obligate and bind themselves as follows, to wit:

"Article first. The parties of the first part grant to the parties of the second part, upon the terms and conditions hereafter provided, a lease for a period of ten years, of the sugar-house situated on the Barbreck plantation, together with all the machinery and appurtenances thereto belonging, it being understood and agreed that this lease shall cover and include all the present enclosure around the Barbreck sugar-house and so much in addition towards the Anchorage plantation as may be necessary to provide space for handling cars, and, further, the land between the cane yard and the bayou, except the public highway, which shall be used in common by the parties hereto, provided, that the lease shall not include any cabins or dwelling-houses which may be situated on the aforesaid premises, the parties of the first part reserving to themselves the right to remove any and all such cabins or dwelling-houses off the said premises which the parties of the second part shall have the right at their option to require.

"First. It being shown that the cane sold by appellees, J. U. Payne & Company et als., to the Ferris Sugar Manufacturing Company, Limited, pursuant to the contract between the parties, was grown on lands not embraced within the

---

"And it is agreed and understood that the lease shall further cover and include the right to make such additions, alterations or modifications, to or in said sugar-house, as the parties of the second part may desire to make, using, at their option, all the brick and other material now on the aforesaid premises, the right being further reserved to the said parties of the second part to drain the aforesaid leased premises into the regular plantation ditches and drains.

"But the parties of the second part hereby covenant and bind themselves to make, at least, and, in any event, such additions and alterations to and in said sugar-house, as will enable it conveniently and in suitable time to take off the crops of the Barbreck, St. Peter's and Anchorage plantations.

"Article second. The consideration of the aforesaid lease shall be the sum of twenty thousand dollars ($20,000), or two thousand dollars ($2000) per annum, which the parties of the second part bind and obligate themselves to pay in semi-annual instalments of one thousand dollars ($1000) each, the first instalment to be due and payable on the first day of January, 1893, and the others every six months thereafter.

"And it is understood and agreed that while all the terms and stipulations of this contract shall be absolutely and irrevocably binding from the date of its execution, the rent, as above stipulated, shall not begin to run until the first day of October, 1892.

"Article third. It is further understood and agreed that there shall be built immediately, or as soon as practicable after the execution hereof, a tramway and bridge from the Barbreck sugar-house through the St. Peter's plantation, on the Barbreck side of the bayou, to the boundary line of the Prosser plantation, for the purpose of conveying the crops of the said plantation to the sugar-house.

"The parties of the first part contract and agree, on their part, to grade the beds of the said tramways and to haul all the necessary materials for their construction, the parties of the second part covenanting and agreeing on their part to furnish all the material and to complete the tramways and build the bridges, after the grading and hauling aforesaid shall have been done.

"And, after the first crop season after the execution hereof, the parties of the second part bind and obligate themselves to build, on the same terms and conditions as are provided above, a branch tramway from the main tramway on the Barbreck plantation, hereinabove provided for, across the St. Peter's bridge and through the St. Peter's field on that side of the bayou up to the line of the Morgan railroad. And the parties of the second part shall have the privilege of carrying the tramways entirely through all or either of the said three plantations, so as to be able to extend them beyond.

limits of the premises leased to the Ferris Sugar Manufacturing Company, Limited, are appellees, under the laws of Louisiana, considered in connection with the provisions of the contract, entitled to the lessor's privilege to secure the payment of the purchase price of such cane?

"Article fourth. The parties of the second part shall further have the right of way for a railroad to connect the Barbreck sugar-house with the Morgan railroad, including the consent of the parties of the first part to their building a railroad bridge across the bayou at the grade level of the Barbreck cane yard, and the further right to construct and operate telegraph and telephone lines along all the aforesaid tramways and railroad.

"The parties of the second part shall further have, during the lease, a full and complete right of way over the road connecting the Barbreck sugar-house and the railroad depot, and the further right to establish and operate during the lease at some suitable place on one of the three aforesaid plantations a kiln for burning brick.

"Article fifth. But it is distinctly understood and agreed that the aforesaid tramways and railroad must be so constructed as not to interfere with the drainage facilities of the aforesaid three plantations or either of them.

"And as the courses of the aforesaid tramways and railroad are not definitely fixed herein, it is further understood and agreed that as soon as the said courses shall have been mutually agreed upon and the tramways and railroad built, they shall *ipso facto* become the courses contemplated herein, and neither of the parties hereto shall have the right to change the same, or either of them, without the other's consent.

"Article sixth. The parties of the first and second part hereto further covenant and agree mutually to sell and purchase respectively upon the following terms and conditions, all the cane which may be grown on the three aforesaid plantations, viz.: the Barbreck, St. Peter's and Anchorage plantations, except such as may be needed each season as seed for the following year.

"Article seventh. The parties of the first part shall cultivate the plantations in case, or so much thereof as would be justified by usual and improved agricultural methods.

"Article eighth. The cane shall be delivered at the sugar-house or at the tramways, at the option of the parties of the first part, to cars furnished by the parties of the second part, the said cars to be loaded to their full capacity by the parties of the first part.

"Article ninth. The parties of the first part shall have the absolute right to deliver, on and after the fifteenth day of October of each season, and the parties of the second part shall be bound and obligated to accept, unless hereinafter provided to the contrary, so much cane each working day as shall represent the average amount necessary to be delivered per day, to complete the delivery by the twenty-fifth day of December following, the said average to be based upon the number of working days between the

"Second. Under the terms of the thirteenth article of the contract between the Paynes and the Ferrises, and to secure the payment of the price of the sugar-cane sold and delivered under said contract, have the appellees, H. M. Payne, J. U.

---

fifteenth of October and the twenty-fifth of December and the total estimated tonnage of the three plantations.

"The said estimate shall be made on the first day of each October by the parties of the first part and shall be submitted in writing to the parties of the second part, who shall have the right to make a personal inspection of the crop; and, in case of a disagreement between the parties hereto as to the tonnage, they shall agree upon an umpire, whose decision and estimate shall be final and binding on all parties hereto.

"Article tenth. The parties of the second part shall not be bound to accept cane frozen standing more than eight days after a freeze, but windrowed cane uninjured by freeze shall be paid for on the same basis as uninjured standing cane.

"And all cane must be cut as close to the ground as practicable and not above the first red joint; and it must be delivered promptly after cutting, freed from trash, as is customary in Louisiana. Nor shall the parties of the second part be bound to accept any cane the juice of which shall test less than 9 per cent sucrose.

"Article eleventh. The price to be paid by the parties of the second part shall be graduated according to the percentage of the sucrose content of the juice of the cane, as expressed at the mill and the average market price as determined by the New Orleans quotations of prime yellow clarified sugar, during each delivery week, plus the bounty, this price to be estimated on a basis of four dollars per ton for cane when the sucrose content of the juice is 11 per cent and the average market price of prime yellow clarified sugar plus the bounty is five and a half cents per pound, or 6.6 cents for every one per cent of sucrose in the juice, thus:

"11 per cent x 6.6 x 5½, equals $4.00.

"Article twelfth. The parties of the first part shall have the right to appoint a representative, who shall have access to the mill at all times, for the purpose of testing the juice or for any other purpose, legitimately and reasonably pertaining to the interests of the said parties of the first part under this contract.

"The juice shall be tested daily or as often as either party may desire, and immediately or as soon as practicable after it is expressed. And in case more than one determination is made during a day, the average result shall be taken as the basis of payment for that day. And in case of disagreement between the parties hereto as to the percentage of sucrose content, Dr. W. C. Stubbs, of New Orleans, shall be the umpire, and his decision and figures shall be binding.

"Article thirteenth. The price of cane as above determined shall be paid as follows:

Payne and the members of the firm of J. U. Payne & Company, an equitable lien upon the bounty money collected from the United States by the receiver in this suit?

"Third. If the second question shall be answered in the

---

" Two and $\frac{75}{100}$ dollars per ton shall be paid every Monday, for the cane delivered during the preceding week, until the delivery is completed. The balance, if any, per ton, shall operate as a lien and privilege to the full extent of such balance on the first bounty money received by the parties of the second part on sugar produced from cane ground at the Barbreck sugar-house, and the said parties of the second part covenant and agree to consecrate solely to the payment of such balance all bounty payments so received by them, until the whole of the said balance shall have been paid.

"Article fourteenth. But, whereas, there is recorded against the premises hereinabove leased, a mortgage to secure the payment, at maturity, of four promissory notes, each note being for the sum of four thousand one hundred and sixty-six dollars and sixty-six cents and bearing interest at the rate of four per cent per annum from the first day of January, 1890, until they respectively mature; and

" Whereas, the said notes mature on the first of January, 1893, the first of January, 1894, the first of January, 1895 and the first of January, 1896, respectively :

" Now, therefore, in order to secure the parties of the second part in the quiet enjoyment of the said leased premises and the prompt payment of the said notes, principal and interest, as they respectively mature;

" It is understood and agreed that the parties of the second part shall have the right and privilege of reserving each season until all the aforesaid notes shall have been paid, the rent which may be due under the terms of this contract on the first day of January of each season, and, in addition, so many of the cash weekly payments for cane, hereinabove provided for, next preceding the first day of January of the said season, as will together with the rent as aforesaid, aggregate the amount, principal and interest, of the note falling due on the first of January of that season.

" The amount so reserved shall be held by the said parties of the second part in trust for the parties of the first part, and in case the said note is not promptly paid at maturity by the parties of the first part, then, for their own protection, the parties of the second part shall have the right to apply the amount reserved as above provided, to the payment of the note, principal and interest, charging the amount so applied to the account of the parties of the first part.

" But, if the parties of the first part shall promptly pay at maturity the note falling due on the first of January of any season then in that event the amount reserved, as above provided, by the parties of the second part for the payment of that note, shall immediately become due and payable to the parties of the first part.

" The parties of the first part further covenant and agree to remove all

affirmative, cah such equitable lien, under the laws of Louisiana, be so enforced in the present suit as to appropriate the bounty money to the payment of the claim of the Paynes, to the exclusion of the general creditors of the Ferris Sugar Manufacturing Company?"

other liens and privileges on the leased premises and to keep the same free from all other liens and privileges during the term of this lease.

"Article fifteenth. In the event of a temporary closing and shutting down of the mill, as the result of fire, explosion, breakage or other purely fortuitous cause, the parties of the second part shall not be bound to receive cane during such time and shall not be liable in damages to the parties of the first part for such non-receipt, but during such temporary shutting down of the mill, the parties of the first part shall have the right to dispose of so much cane, as the parties of the second part would otherwise have been compelled, under the terms of this contract, to receive, in any way they may see fit and they shall furthermore have the right to use for such purpose, free of charge, all the tramways, cars and other transportation facilities of the parties of the second part.

"And the parties of the second part stipulate and agree to use every reasonable effort to repair and make all such delays as short as possible.

"Article sixteenth. In case of total loss of the sugar-house, mill and machinery, by fire or otherwise, this contract may be terminated, at the option of the parties of the second part.

"Article seventeenth. It is agreed and understood that the value of the Barbreck sugar-house machinery and appurtenances, as they stand at the date of this contract, shall be estimated by three appraisers to be appointed as follows: One by each of the parties hereto, and the third by these two.

"And the parties of the second part covenant and agree to take out thereon, in the name and for the benefit of the parties of the first part, and to keep in force during the term of this contract, a policy of insurance against fire, for the full value as above determined, provided, that this valuation shall not exceed the sum of ten thousand dollars, and to pay the premium on the said policy for the benefit of the parties of the first part, during the term of this contract.

"Article eighteenth. The parties of the second part further covenant and agree to pay during the term of this contract any and all extra taxes which may result from increased assessment of the leased property on account of the improvements put upon it by the said parties of the second part.

"Article nineteenth. On the termination of this contract, by limitation or as otherwise provided therein, the parties of the second part shall have the right to remove and take away all the improvements, of whatever kind or description, including tramways, which they may have put upon the leased premises, on condition, however, of paying, before such removal, to the parties of the first part an amount which shall represent the depreciation in value of the sugar-house, machinery and appurtenances belonging to the said

*Mr. John S. Blair, Mr. Walter H. Saunders, Mr. J. D. Rouse* and *Mr. William Grant* for appellants.

*Mr. Charles E. Fenner* for appellees.

---

parties, as a means of manufacturing sugar from cane, the present value to be that determined by the appraisement hereinabove provided for, and the value at the termination of this contract to be determined by a similar appraisement, it being understood and agreed that the latter appraisement shall be made solely with reference to the relative efficiency and value of the said sugar-house, machinery and appurtenances for the manufacture of sugar from cane, without regard to the profits of the industry or the depreciation in value of as the result of the introduction of new and improved machinery or methods of manufacture.

"Article twentieth. The parties of the first part agree to keep all such books and records as are required by the United States Government in relation to the bounty, and to furnish to the parties of the second part all the details which may be necessary to enable them to effectuate their bounty rights.

"Article twenty-first. Nothing in this contract shall be construed as to authorize the establishment or conduct of a store of any sort or description upon the leased premises, by the parties of the second part or others.

"Article twenty-second. It is further mutually understood and agreed that in case the bounty now paid upon sugar by the United States Government is removed during the term of this contract, then, and in that event, either of the parties hereto may at their option terminate the contract, but as regards the parties of the first part, it is understood and agreed that this right of terminating the contract shall extend only so far as their obligation to cultivate and deliver cane is concerned, the right and option being reserved to the parties of the second part, in the event of an exercise by the parties of the first part of their right of termination under this section, to continue the lease as herein stipulated upon the same terms and conditions, except as hereinabove provided.

"Article twenty-third. And whereas, the parties hereto recognize that despite the genuine and earnest efforts of the parties of the second part to construct and put in operation the contemplated mill in time for the next grinding season, after the execution hereof, such a consummation may be rendered practically impossible by events absolutely beyond the control of the said parties hereto, it is therefore understood and agreed that if by reason of such unforeseen events it shall become practically impossible to construct and put into operation the said contemplated mill in time for the next grinding season after the execution hereof, then, and in that event the said parties of the second part shall be bound to receive under the terms and conditions of this contract, during said next grinding season, only the cane grown on the Barbreck plantation, and the parties of the first part shall have the right to dispose of the St. Peter's and Anchorage crops

*Mr. Frank McGloin* and *Mr. James David Coleman* filed a brief for the Reading Iron Co., appellees.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

during said season, in any way they may see fit with the privilege of using for such purpose, free of charge, any and all the transportation facilities of the parties of the second part.

" But nothing in this section shall be so construed as to relieve the parties of the second part from their obligation under this contract to purchase the crops of the three aforesaid plantations in case of their failure to construct and put in operation the said contemplated mill in time for the next grinding season, if such failure shall result from the financial inability of the said parties of the second part to meet their engagements or from a want of exercise by them of all due caution, prudence and foresight to that end.

" Article twenty-fourth. It is further understood and agreed that the parties of the second part shall have the right and privilege of subrogating to their rights and liabilities under this contract at any time during the term thereof a corporation duly organized, provided, it be satisfactorily shown that the said corporation be legally organized and competent to contract, that it is the absolute owner and proprietor of the property, machinery, rights and effects of every kind and description which shall have belonged to the parties of the second part hereto and shall be situated upon the three aforesaid plantations or either of them, and that the said property, machinery, rights and effects are free from any and all liens and incumbrances except the lien of the lessors under this contract, and on this condition, the parties of the first part covenant and bind themselves to accept the aforesaid corporation as the substitute of the parties of the second part hereto and to release the said parties from any and all subsequent liability hereunder.

" Article twenty-fifth. It is finally understood and agreed that this is an entire contract, each stipulation and obligation herein being a part of the consideration for every other.

" In witness whereof, the aforesaid parties have hereunto affixed their hands on this 16th day of June, 1892.

(Signed)                                           H. M. PAYNE.
                                                   J. U. PAYNE.
(Signed)   L. MURRAY FERRIS.                       J. U. PAYNE & Co."
           WM. L. FERRIS."

3. Under article twenty-four (24) of said contract, the said L. Murray Ferris and Wm. L. Ferris transferred all their rights and liabilities, under said contract, to the Ferris Sugar Manufacturing Company, Limited, a corporation organized under the laws of Louisiana.

By Article 3183 of the Civil Code of Louisiana, it is provided : " The property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors

---

4. The McKinley tariff act, passed October 1, 1890, which provided for a bounty to sugar-producers, was repealed on August 28, 1894, and on September 3, 1894, it was stipulated between the parties to said contract that the provisions of articles eleven and thirteen thereof should be extended so as to apply to any bounty that might thereafter be granted by Congress to sugar produced from the crop 1894.

5. The Ferris Sugar Manufacturing Company, Limited, operated the Barbreck sugar-house under the terms of said contract from October, 1894, to January 4, 1895, and the said parties of the first part, J. U. Payne & Company et als., delivered to the said Ferris Sugar Manufacturing Company during that season, under said contract, ten thousand three hundred and seventy-seven (10,377) tons of cane grown upon premises other than those leased to said Ferris Company, for which the said Ferris Company owed a balance on the purchase price of four thousand five hundred and sixty-four and $\frac{73}{100}$ dollars ($4564.73) on the contract basis of $2.75 a ton, and a further sum of six thousand five hundred and seventy-nine and $\frac{30}{100}$ dollars ($6579.30) in the event that the bounty should be collected.

6. In the fall of 1894 the Ferris Sugar Manufacturing Company, Limited, became heavily involved in financial difficulties, and prior to this a number of creditors, among them the Reading Iron Works Company and John H. Murphy, recorded vendors' privileges upon the machinery sold by them to the said Ferris Sugar Manufacturing Company, Limited, and erected by it in the said Barbreck sugar-house.

7. On January 4, 1895, the Burdon Central Sugar Refining Company, Limited, a corporation organized under the laws of New York and an unsecured creditor of the Ferris Company to the extent of forty thousand four hundred and four and seventy-four one-hundredths dollars ($40,404.74), its entire debt, filed a bill in equity in the Circuit Court of the United States for the Eastern District of Louisiana, alleging that the Ferris Sugar Manufacturing Company, Limited, was heavily indebted and insolvent, and that its assets would be sacrificed by numerous creditors who were about to bring suit. The bill prayed for the appointment of a receiver to take charge of all the assets of said company. On the same day the defendant company filed an answer, with a resolution of its board of directors annexed authorizing such action, admitting all the facts charged in the bill, and uniting in the prayer for a receiver. A receiver was thereupon appointed.

8. On March 25, 1895, H. M. Payne, J. U. Payne and J. U. Payne & Company filed a petition of intervention in this suit, stating, among other things not relevant to this certificate, the said balance of $4564.73 and of $6579.30 due them for cane delivered to the said Ferris Sugar Manufacturing Company, Limited, and claiming that both sums were secured by a

some lawful causes of preference"; by Article 3184: "Lawful causes of preference are privilege and mortgages";. by Article 3185: "Privilege can be claimed only for those debts .to which it is expressly granted in this code"; by Article 3186: "Privilege is a right, which the nature of a debt gives to a creditor." Article 2705 provides: "The lessor has, for the payment of his rent, and other obligations of the lease, a right of pledge on the movable effects of the lessee, which are found on the property leased." . . . And by Article 3263 this privilege is made superior to the privilege of a vendor.

Judge Parlange, holding the Circuit Court, was of opinion that under the terms of the contract the purchase price of the

---

lessor's privilege on the property of the defendant company at the Barbreck sugar-house, and that the latter sum, namely, $6579.30, was also secured by an equitable lien on any bounty that might thereafter be collected by the receiver. The receiver and the Ferris Company filed an answer to this petition, admitting the correctness of the amounts claimed, but denying that they were secured as averred. The Burdon Central Sugar Refining Company adopted the answer of the receiver. Issue was joined by replication and the matters in issue were referred to a master to report upon the law and the facts. The master allowed the amounts claimed by interveners, but rejected their claims both to a lessor's privilege to secure these amounts and to an equitable lien on the bounty. Upon exceptions to the master's report the court decreed that interveners were entitled to a lessor's privilege upon the movable effects of said Ferris Company and of third persons upon leased premises to secure both said sums due for the unpaid price of the sugar cane, in addition to an equitable lien on the bounty to secure the said sum of $6579.30, in preference to all other creditors of the said Ferris Sugar Manufacturing Company, Limited.

9. From this decree the Burdon Central Sugar Refining Company, complainants, the Reading Iron Company and John H. Murphy, interveners in this suit, as creditors of the Ferris Sugar Manufacturing Company, Limited, for large amounts, took an appeal and made the following assignment of errors:

First. Said court erred in decreeing that said interveners, J. U. Payne et al., are entitled to a privilege and right of pledge as lessors upon the movable effects of the defendant on the leased premises to secure the sums due said interveners for cane sold and delivered by them to said defendant amounting to $4564.73 and $6579.30.

Second. Said court erred in decreeing that said interveners are entitled to an equitable lien on the bounties which may be collected on sugars made from cane belonging to said interveners and taken off by the defendant or its receiver."

cane delivered by the sellers, the lessors, to the purchasers, the lessees, was secured by the lessors' privilege, because under the contract the obligation to pay the price of the cane was one of the essential obligations of the lease, and, therefore, covered by the words " other obligations of the lease."

Counsel's contention is that by reason of these words the privilege extends to every obligation created by a contract of lease, and *Warfield* v. *Oliver*, 23 La. Ann. 612; *Fox* v. *McKee*, 31 La. Ann. 67; and *Henderson* v. *Meyers*, 45 La. Ann. 791, are cited as maintaining that view. In the first of these cases it was held that the obligation resulting from a clause in a lease providing that the lessee should repair and keep in repair the leased premises was secured by the lessor's privilege. In the two other cases, it was decided that when a contract of lease provided for an attorney's fee in the event of suit to recover the rent, the amount of the stipulated fee was also so secured. But it may be observed that repairs to be made to leased property are in their very nature incidental to a lease of the property, and that such a stipulation as to an attorney's fee is a mere accessory to the rent itself.

It is further contended that the Code Napoleon and the Louisiana Code on the subject of the lessor's privilege are substantially alike, and that the French commentators and the decisions of the French courts support the proposition that the lessor's privilege secures not only the rent but also advances made during the course of the lease for the execution of the lease; that the meaning of the Louisiana law should be regarded as settled by this construction; and that as the price of the cane delivered under this contract would be secured by the privilege of the lessor under the law of France, the same conclusion follows here.

Article 2102 of the Code Napoleon provides that the lessor shall have a privilege for "the repairs which the tenant is bound to make (*réparations locatives*), and for everything that concerns the execution of the lease." Many French commentators are referred to as establishing that under this provision the privilege of the lessor extends to and secures advances made by him to a lessee, and they undoubtedly maintain that

under the French law the amount due for raw material delivered by a lessor to the lessee of a manufacturing establishment for the purpose of being worked at the factory, under the terms of the lease, would be secured by the lessor's privilege.

Laurent, Droit Civil Français, vol. 29, 4th ed. 1887, §§ 407 and 408, states the principle thus:

"By execution of the lease we understand all the obligations which the law or the contract imposes on the lessee; those which the law establishes are considered as agreed between the parties; all, therefore, concern the execution of the contract. . . . Are advances which the lessor makes under the contract of lease to the lessees secured by his privilege? The affirmative is adopted by jurisprudence. It is incontestable when the advances concern the lease, that is to say, the rights and obligations which result from it. In this case, both the letter and spirit of the law are applicable. But if a loan of money were made to the lessee, in the contract of lease, without there being any relation between the loan and the lease, this would not be an advance; it would be an ordinary loan, and the law gives no privilege for such a loan. Jurisprudence adopts this view: for if it grants a privilege to the lessor for the advance which he makes, it is because these advances concern the lease. The owner of an iron furnace stipulates to furnish to the lessee of his furnace the wood necessary to operate it; it has been adjudged that such an advance is privileged. Such is also the case when the lessor furnishes beets to the lessee of a sugar factory. The lessor furnishes 10,000 francs to the lessee of a mill as a fund to be used in operating it. The advance being intended to operate the mill, therefore its object was the execution of the lease and the claim is privileged."

The only decision of the French courts cited in argument is referred to by Laurent, and is the case of *Vanderaghen c. Decocq*, decided 18th of April, 1850, by the Court of Appeals of Douai (not by the Court of Cassation as inadvertently stated by counsel), and reported in Journal du Palais, vol. 56, (1851) 395.

The following statement made by the court of original

jurisdiction was adopted by the Court of Appeals in affirming the judgment:

"Considering that, as regards the claim of 6800 francs for rentals, the privilege of Decocq is not contested by the defendant and is besides expressly established by Art. 2102 of the Civil Code; that according to Par. 1 of that article, the same privilege takes effect for repairs chargeable to the tenant and for everything that concerns the execution of the lease; that it is by virtue of a clause of the lease and for the execution of that clause and in order to insure the operation of the factory leased, that the Decocqs have delivered and furnished to Blanquart beets to the value of 8086 francs; that Article 9 and following of said lease required them to plant beets on 53 hectares and 19 acres and to furnish and deliver to the factory the entire product of the crop at the price of 16 francs per 1000 kilos. of beets and under a penalty of 150 francs damages for each 35 acres of beets not delivered; that all the authors and jurisprudence grant the privilege of Art. 2102 to the lessor, who has made advances and furnished commodities, as in this case, by virtue of a clause of the lease and for the execution of the lease; it is held that under the terms of Art. 2102, the claim of Decocq is privileged as well for the beets furnished as for rentals."

Whether the language of the Louisiana Code, "every obligation of the lease," may not justly be held to be narrower than the words "everything that concerns the execution of the lease," as found in the Code Napoleon, and, therefore, whether the latter would secure by the lessor's privilege an advance made by the lessor, which would not be so secured under the Louisiana law, we need not discuss, for even conceding that the two codes are alike, and that the provisions of both support the theory relied on, yet we think that under the provisions of this contract the price of the cane was not secured by the lessor's privilege. The test applied by the French writers to ascertain whether the particular obligation is secured by the lessor's privilege, is whether the obligation created by a particular clause in a contract of lease is really a part of the contract of lease proper, or an obligation necessary

for its execution. Thus Laurent, as we have just seen, says: "But if a loan of money were made to the lessee, in the contract of lease, without there being any relation between the loan and the lease, this would not be an advance; it would be an ordinary loan, and the law gives no privilege for such a loan."

And the conclusion of the Court of Appeals of Douai, in the case cited, rested on the fact that the particular contract there considered made the price of the beets a part of the contract of lease, and intended for the execution of the lease.

It is clear, then, that though we concede the view of the Louisiana law contended for by appellee, the question still remains: Did the obligation to pay for the cane as stipulated in this contract make such obligation a part of the lease itself, or did the duty to pay under the contract result not from the lease but from another and distinct contract, namely, one of sale, not contemplated by the parties to be considered as a part of the lease as such, and, therefore, not secured by the lessor's privilege? The learned District Judge proceeded on the ground that there was an identity between the French and the Louisiana law; that the interpretation of the one was persuasive in respect of the other; and that under both laws the privilege claimed should be allowed; but to reach this result he also held that the contract was brought within this view of the law because the sale of the cane as between the parties to the contract was "an essential consideration of the lease, both on the part of the lessors and lessees."

We should remember that the contract must be so construed as to give meaning to all its provisions, and that that interpretation would be incorrect which would obliterate one portion of the contract in order to enforce another part thereof. Civil Code, Art. 1951. And that as privileges under the law of Louisiana are in derogation of common right, they cannot rest on implication, and can only result from express terms or from clear and irresistible intendment. *Shaw* v. *Grant*, 13 La. Ann. 52; *Citizens' Bank* v. *Maureau*, 37 La. Ann. 857.

In *Case* v. *Taylor*, 23 La. Ann. 497, the Supreme Court of

Louisiana said: "It matters not what name the parties have given to the instrument, its character is determined by its constituent elements."    Article 2063 of the Civil Code (an article not found in the French Code) provides: "A *conjunctive* obligation is one in which the several objects in it are connected by a copulative, or in any other manner which shows that all of them are severally comprised in the contract.    This contract creates as many different obligations as there are different objects; and the debtor, when he wishes to discharge himself, may force the creditor to receive them separately"; and Article 1883, that "every contract has for its object something which one or both of the parties oblige themselves to give, or to do, or not to do."

The writing before us embodies, in fact, two contracts, a contract of lease and a contract of sale.    If we were compelled to treat it as a single indivisible contract, what would be its proper denomination?    The sale of the cane was manifestly more important to Payne & Company than the lease of the sugar-house.    By the contract they severed their lands into two parcels, leasing, for a time and price fixed, one part thereof with the sugar-house, and retaining the remainder, which they were to cultivate, and the crop upon which the Ferrises agreed to purchase.    Apparently the lease was the inducement to the sale rather than the sale the inducement to the lease.    So that if there was a loss of identity, which form of contract absorbed the other?    We do not think, however, the effect of the document was to fuse the two into one, but that a contract of sale and a contract of lease were both provided for.    The preamble recites: "Whereas the said L. Murray Ferris and William L. Ferris, parties of the second part, as aforesaid, have proposed to contract, upon the terms and conditions hereinafter provided, *for a lease* of the Barbreck sugar-house and *the purchase* of the crops of the three aforesaid plantations."    And articles one to five regulate, in substance, the relations between the parties as landlord and tenant, while articles six to thirteen govern the sale of the crops.

Article six says: "The parties of the first and second part

hereto further covenant and agree mutually *to sell and purchase respectively* upon the following terms and conditions, all the cane which may be grown on the three aforesaid plantations, viz.: The Barbreck, St. Peter's and Anchorage plantations, except such as may be needed each season as seed for the following year." Article eleven: "The price to be paid by the parties of the second part shall be graduated according to the percentage of the sucrose content of the juice of the cane," etc.

Article thirteen: "The price of cane as above determined shall be paid as follows: Two and $\frac{75}{100}$ dollars per ton shall be paid every Monday, for the cane delivered during the preceding week, until the delivery is completed. The balance, if any, per ton, shall operate as a lien and privilege to the full extent of such balance on the first bounty money received by the parties of the second part on sugar produced from cane ground at the Barbreck sugar-house," etc.

We do not see how it can be successfully denied that there was a contract of sale as well as a contract of lease, and, this being the fact, it is impossible to so read the writing as to destroy the one in order to give effect to the other. And, in interpreting the contracts, if all the obligations which they created, excepting those essentially necessary to the existence of the contract of sale, should be attributed to and treated as obligations of the lease, this would not make the duty to pay for the cane an obligation of the lease, because price is of the essence of the contract of sale under the law of Louisiana, and without price there can be no sale. Civil Code, Art. 2439. This conclusion is strengthened when we consider that the contracting parties themselves sedulously separated the obligation to pay the price of the cane from the other obligations by stipulating that the price should be secured by a privilege and lien entirely independent of the lease. Thereby the duty to pay for the cane was treated as resulting from a sale and secured by a privilege specially provided for upon the bounty money, which is inconsistent with the view that the contracting parties contemplated that the duty to pay for the cane resulted not from a sale but purely from a lease. It is true

that the mere taking of security for the obligations of the lease would not import that the lessor's privilege created by law in favor of these obligations was abrogated, yet when the necessary effect of the contract under consideration is to separate the duty to pay for the cane from the obligations of the lease as such, and to secure it separately, the stipulation as to security is entitled to great weight as tending to show that the parties regarded the obligations of the lease as one thing and the obligation to pay the price separately secured as another.

Privilege, says the Code, is the right " which the nature of the debt gives to the creditor." Now the stipulation was that the price of the cane should be secured by a *privilege on the bounty money*, and this clearly justifies the assumption that the parties proceeded on the theory that the price of the cane arose from a different consideration and created a different obligation from the obligations created by the lease.

Again, the twenty-second article of the contract expressly provided for the continuance of the lease at the option of the lessee, the manufacturing company, even after the lessors had been discharged from all obligation to cultivate or deliver cane to the company. That article is:

" It is further mutually understood and agreed that in case the bounty now paid upon sugar by the United States Government is removed during the term of this contract, then, and in that event, either of the parties hereto may at their option terminate the contract, but as regards the parties of the first part, it is understood and agreed that this right of terminating the contract shall extend only so far as their obligation to cultivate and deliver cane is concerned, the right and option being reserved to the parties of the second part, in the event of an exercise by the parties of the first part of their right of termination under this section, to continue the lease as herein stipulated under the same terms and conditions, except as hereinabove provided."

How can it be concluded that the cultivation, delivery and sale of the cane on the one hand, and the payment of the price therefor on the other, was an essential and necessary part of the continuance of the contract of lease, when the contracting

parties themselves declared that, although all obligation to cultivate and deliver cane and to pay for the same should be dispensed with, the lease itself might continue to exist for its full term? And it may be observed, in this connection, that the contingency as to the bounty had happened before any delivery whatever had been made under the contract. If, in the year following, the vendor had exercised his option to cease delivering cane and the vendee had continued to lease, could it have been said that there was no lease because the obligation to deliver cane had disappeared, when the contract itself provided that this should not be the case? As the contract of lease provided for the erection by the lessor of new machinery in the sugar-house, and therefore must be considered to have contemplated a debt as arising from its execution, it appears to us that it was the plain duty of the lessors, if their intention was that the purchase price of the cane should be an obligation of the lease secured by a lessor's privilege, to have so stipulated in unambiguous terms. And, as this was not done, but on the contrary, as the obligation to pay for the cane was stated in the contract as arising from the sale, and was separated from the obligations of the lease by the reservation of a privilege and lien on the bounty money, the rule of strict interpretation precludes us from so reading the contract as to enlarge its terms to import a privilege not necessarily resulting therefrom.

Nor do we think that the twenty-fifth article, providing that "this is an entire contract, each stipulation and obligation herein being a part of the consideration for every other," tends to impair the conclusions we have indicated. The parties treated the written agreement as embodying both a sale and a lease as independent contracts. (Code, Art. 1769.) The contract of lease is essentially commutative (Code, Art. 2669), and Article 1768 of the Code defines such contracts thus: "Commutative contracts are those in which what is done, given or promised by one party, is considered as equivalent to, or a consideration for what is done, given or promised by the other." It was because the parties considered the agreement as embodying independent stipulations that the

provision before quoted was inserted, for it would otherwise have been superfluous; while considering them as independent contracts, the stipulation making them interdependent created the right to rescind the one in case of the violation of the other.

We hold, then, that the price of the cane delivered under the contract was not secured by the lessors' privilege, and that the first question must be answered in the negative.

2. The thirteenth article of the contract reads as follows:

"The price of cane as above determined shall be paid as follows: Two and $\frac{75}{100}$ dollars per ton shall be paid every Monday, for the cane delivered during the preceding week, until the delivery is completed. The balance, if any, per ton, shall operate as a lien and privilege to the full extent of such balance on the first bounty money received by the parties of the second part on sugar produced from cane ground at the Barbreck sugar-house, and the said parties of the second part covenant and agree to consecrate solely to the payment of such balance all bounty payments so received by them, until the whole of the said balance shall have been paid."

If it was within the power of the contracting parties to create an equitable lien upon the bounty collected, the terms of the contract effectuated that purpose. *Walker* v. *Brown*, 165 U. S. 654, and cases cited.

The right of the parties, however, by the contract to create an equitable lien and the power of a court of equity to enforce such lien is denied upon the ground that, as by the provisions of the law of Louisiana equality of distribution is the rule among creditors, and preferences can only result from privileges and mortgages, and as the subject-matter from which the lien here arose was not one of the cases to which the law of Louisiana gives a privilege, therefore an equitable lien could not be created by contract or enforced in violation of the terms of the statutes of Louisiana. But, without passing on the correctness of this proposition, we think it has no relation to the matter under consideration. The bounty on sugar was derived wholly from the act of Congress of October 1, 1890, providing therefor, (26 Stat. 567, c. 1244,) and the act of

March 2, 1895, making a partial allowance for the repealed bounty (28 Stat. 910, c. 189); *United States* v. *Realty Company*, 163 U. S. 427. The bounty was given by the terms of the act of 1890, not to the manufacturer of sugar manufactured within the United States, but to the producer of such sugar from "beets, sorghum and sugar-cane grown within the United States." In this way the law in conferring a bounty created a link between the manufacturer of the sugar and the grower of the beets, sorghum or cane from which it was manufactured. And this connection between the manufacturer and the grower being created by the act of Congress in conferring the bounty only for sugar manufactured from cane grown within the United States, the relation between the grower and the manufacturer was one arising from the laws of the United States, and not from the local law of the State of Louisiana. As a transfer of the claim against the United States derived from the bounty could not have been given by the manufacturer who received the cane of the grower without a violation of section 3477 of the Revised Statutes, the contention of appellants denies to the grower of cane on its delivery to a manufacturer any security whatever; but this would be incompatible with the purposes and objects of the acts of Congress, and would cause the statutes of Louisiana to operate upon, and in a measure render nugatory, laws of the United States. The parties to the contract had in view in making it the necessary relation between them accorded by the act of Congress, for the contract stipulated that the parties of the first part should "keep all such books and records as are required by the United States Government in relation to the bounty, and to furnish to the parties of the second part all the details which may be necessary to enable them to effectuate their bounty rights." The right to collect the bounty having arisen from a law of the United States, and the provisions of that law creating a necessary relation between the grower and the manufacturer, making them in effect joint producers of the sugar, the right to the equitable lien stipulated by the contract was not controlled by the provisions of the local law of Louisiana, even although as a gen-

eral rule, and in regard to this we express no opinion, the effect of that law would be to deprive contracting parties, except when expressly allowed, of the right to contract for an equitable lien; and to deny to courts of equity the power to enforce the same.

These considerations lead to an affirmative answer to the second and third questions.

> *The first question is answered in the negative and the second and third questions in the affirmative, and it will be so certified.*