**AMERICAN SENIOR DEVELOPMENT, L.L.C. Plaintiff–Appellant,**

v.

**PARKSIDE OF COLLIERVILLE, L.L.C., Parkside Property Investors, L.L.C., and Parkside Senior Services, L.L.C. Defendants–Appellees.**

No. 02–6346.

United States Court of Appeals, Sixth Circuit.

June 9, 2004.

James R. Garts, Jr., Michael F. Rafferty, Harris, Shelton, Dunlap, Cobb & Ryder, Memphis, TN, for Plaintiff–Appellant.

John S. Wilson, III, Wyatt, Tarrant & Combs, Memphis, TN, J. Timothy Eaton, Beth A. Black, Ungaretti & Harris, Chicago, IL, for Defendants–Appellees.

BEFORE: KRUPANSKY and GILMAN, Circuit Judges; and RUSSELL, District Judge.*

* The Honorable Thomas B. Russell, United States District Judge for the Western District

RUSSELL, District Judge.

American Senior Development ("ASD"), the Appellant, and Parkside of Collierville,[1] the Appellee, entered into a Development Management Agreement on August 13, 1998. This contract governed the design, development, construction, and management of a senior citizens' housing development outside Memphis, Tennessee. As a part of this development, ASD purchased and transferred to Parkside approximately 14 acres of undeveloped land.

Under the contract ASD was meant to receive 6% of the development's budgeted cost in exchange for its service as a project manager. Before construction began, however. Parkside sold the property to another developer. ASD sued for damages under the contract, including the balance of the 6% development fee. The United States District Court for the Western District of Tennessee dismissed ASD's case pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons given below, we affirm.

## I.

The following background is taken from the district court's opinion and is substantially uncontested:

In 1997, ASD, through its president Carlton A. Raff, began negotiating with Parkside Senior Services to acquire, construct, and develop a senior housing planned development project in Collierville, Tennessee, to be known as Wynfield Village. In furtherance of this plan, ASD entered into an agreement to acquire approximately 14.058 acre of unimproved real property located in Collierville, Tennessee (the "subject proper-

ty"). In addition, ASD negotiated with the Town of Collierville to obtain approval of a planned unit development ("PUD") on this property.

On August 13, 1998, ASD and Parkside of Collierville entered into a development management agreement ("the Agreement"), which governed the development and construction of the PUD on the subject property acquired by ASD. Section 1.1 of the Agreement states that ASD assigns its rights to purchase the property to Parkside of Collierville. Section 2.1 provides that Parkside of Collierville retains ASD "to provide supervisory and development management services for the Project, including without limitation, in connection with the design, budgeting, development, permitting and construction of the Project."

Section 4.2, which governs the termination of the contract, states that "this Development Agreement shall terminate, solely at [Parkside's] election in its sole discretion, upon … (II) the sale or other transfer of all or substantially all of the Property. Such election to terminate this Development Agreement shall be made by written notice from [Parkside] to [ASD]." Section 7.2 of the Agreement, which identifies "Event[s] of Default by [Parkside]," provides in relevant part that:

Upon such an event of Default by [Parkside] or in the event that [Parkside] elects, at its option, to terminate this Development Agreement under Section 4.2(i) or Section 4.2(ii).[ASD] shall be entitled to all sums due and owing to [ASD] hereunder as of the date of the occurrence of the Event of Default, including, without limitation payment to [ASD] of the approved

of Kentucky, sitting by designation.

1. There are three interrelated appellees in this case: Parkside of Collierville, Parkside Property Investors, and Parkside Senior Services. They will collectively be referred to as "Parkside."

Pre–Development Costs incurred to the date of termination and the remainder of the entire Development Fee, as set forth in Section 6.2.

Section 20 of the agreement contains an "Anti–Competition Covenant." which bars ASD from acquiring an interest in any property within a ten-mile radius which would be in competition with the project for a period of two years after the completion date. Section 26 states that "time is of the essence of this Development Agreement."

ASD states that it has performed all of its duties and obligations under the Agreement. Specifically, ASD obtained bids and commitments to build the project. As of January 27, 2000, ASD developed a budget in the amount of $16,129,593.00 for the Wynfield Village Project, which it conveyed to the defendants. However. Parkside of Collierville has not begun construction of the project.

Parkside has since sold the 14–acre property to another developer planning to build single-family homes. Parkside has not yet provided any letter or other notice to ASD notifying the latter that the contract is terminated.

The district court concluded "[u]pon examination of the language used in section 4.2(ii), the court agrees with defendants that the provision clearly and unambiguously states that termination does not occur automatically because of Parkside's sale or transfer of the subject property, but rather requires that Parkside actually elect to terminate the agreement in addition to such a sale or transfer."

Under section 7.2 of the contract, if Parkside terminated the agreement then ASD would be due the full 6% of development costs, or approximately $967.776.00. ASD had already received $267,400.00 in incremental payments by the time it sued,

and seeks the remainder, or "balance due." of $700.376.00. ASD also seeks reimbursement for certain other items under the terms of the agreement.

Besides the claims relating to the development, ASD sought in its complaint a declaration from the district court that the anti-competition covenant—section 20 of the contract—was void, and also damages for various other projects in Tennessee, Florida,· and South Carolina. The district court dismissed ASD's request for declaratory relief because ASD had not shown that it has standing because the anti-competition covenant only becomes effective upon the project's completion. Given that neither party expects the project ever to be completed, the covenant will never be effective. The district court allowed ASD's claims arising from the other projects to proceed, but ASD voluntarily dismissed them so that it could pursue this appeal.

## II.

"This court reviews de novo a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint must allege facts, which if proved, would entitle the claimant to relief. The reviewing court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true and determine whether the plaintiff can prove no set of facts in support of his claims that would entitle him to relief." *Arrow v. Federal Reserve Bank of St. Louis,* 358 F.3d 392, 393 (6th Cir.2004) (citations omitted).

Tennessee's law of contracts governs the substantive law of this case, and its courts apply standard rules of contract interpretation:

The cardinal rule in the construction of contracts is to ascertain the intent of the parties. If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made.

*Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 252 (Tenn.Ct.App.2002) (citations omitted).

### III.

■ To determine the outcome of this case we must look first to the plain language of the contract. The disputed section reads:

4.2 *Termination on Transfer.* This Agreement shall automatically terminate upon the sale or other transfer of all of the ownership interests of Carl Raff in Development Manager such that Carl Raff no longer owns, directly, at least a 51% ownership interest in Development Manager. Further, this Development Agreement shall terminate, solely at Owner's election in its sole discretion, upon the happening of: (i) the sale or other transfer of all or substantially all of the ownership interests of Owner Managing Member in Owner: or (ii) the sale or other transfer of all or substantially all of the Property. Such election to terminate this Development Agreement shall be made by written notice from Owner to Development Manager.

The relevant portion read together is "this Development Agreement shall terminate, solely at Owner's election in its sole discretion, upon the happening of the sale or other transfer of all or substantially all of the Property." The district court concluded that "the provision clearly and unambiguously states that termination does not occur automatically as a result of Parkside's sale or transfer of the subject property, but rather requires that Parkside actually elect to terminate the agreement in addition to such a sale or transfer. Thus, even taking as true ASD's allegations that Parkside has agreed to sell the subject property, the court finds that such an event does not trigger termination under section 4.2(ii)."

This reading is consistent with the language in the contract. Courts may look to other, similar provisions to determine the intent of the parties as expressed in the contract. *See, e.g., D & E Constr. Co., Inc. v. Robert J. Denley Co., Inc.*, 38 S.W.3d 513, 519 (Tenn.2001)("[W]e conclude that the maxim *expressio unius est exclusio alterius* is applicable here. Literally translated[:] the expression of one thing is the exclusion of another (of the same kind). Whilst the rule is more frequently applied to the construction of statutes and wills, it equally is applicable to other instruments of writing.") (citations and quotation marks omitted). Here, such comparative analysis may be found within the bounds of section 4.2 itself.

Section 4.2 contemplates the termination of the contract because of a substantial changes in position by either party. It concerns both "the transfer of all of the ownership interests of Carl Raff in [ASD]"

and the transfer of "the ownership interests [in Parkside]" or "the sale ... of the property." Section 4.2 does not on its own terms treat these events the same way, however. The first event in the section—actions by Carl Raff regarding ASD—is prefaced with "[t]his Agreement shall *automatically* terminate" (emphasis added). The second event in the section, i.e., Parkside's transfers, is prefaced with "this Development Agreement shall terminate, *solely at Owner's election in it is sole discretion* ..." (emphasis added). The different treatment of these two events contemplated by section 4.2 indicates that the parties knew how to express their intent to have the contract terminate automatically and chose not to apply automatic termination to the Parkside transfers.

Moreover, as ASD admits, "[i]t is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions, including the signatures, must be given meaning, and force and effect, if that can consistently and reasonably be done. An interpretation which gives reasonable meaning to all of its provisions will be preferred to one which leaves a portion of the writing useless, meaningless, or inexplicable." *In re Pyramid Operating Auth., Inc.,* 144 B.R. 795, 814 (Bankr.W.D.Tenn.1992) (citing *Burdon Cent Sugar Ref. Co. v. Payne,* 167 U.S. 127, 17 S.Ct. 754, 42 L.Ed. 105 (1897)). ASD's reading of section 4.2 either renders the clause "solely at Owner's election in its sole discretion" a nullity, or makes it a nonsensical reaffirmation that Parkside retained the right to sell the property and/or alter its corporate form. The former reading is not favored under law; as to the latter, ASD offers no explanation why this clause is necessary to reaffirm Parkside's right of transfer but not necessary to confirm its own.

ASD argues that the "sole discretion and election" clause modifies the clause that follows it—"upon the happening of"—and that the district court's interpretation of the contract reads this second clause out of the agreement. This is not so. Had the parties intended for the "sole discretion and election" clause to modify the "upon the happening of" clause, the clauses' order would have been reversed, i.e., the contract would read: "this Development Agreement shall terminate upon the happening, solely at Owner's election in its sole discretion, of [the sale or transfer of the property]." But this is not how the contract reads. The "sole discretion and election" clause modifies what precedes it, namely, the termination clause itself. ASD presents no argument beyond its own assertions that the agreement was intended to terminate upon the sale of the property rather than upon Parkside's election.

ASD also argues that the district court's interpretation of section 4.2 "renders meaningless the second paragraph of Section 7.2.3...." The relevant part reads:

> Upon such an Event of Default by Owner or in the event that Owner elects, at its option, to terminate this Development Agreement under Section 4.2(i) or Section 4.2(ii), Development Manager shall be entitled to all sums due and owing to Development Manager hereunder ...

How the district court's reading of section 4.2 is incompatible with this paragraph, or renders it meaningless, is unclear. If anything, the language in section 7.2.3 reconfirms the choice vested in Parkside to "at its option" terminate the agreement.

The plain reading of sections 4.2 and 7.2.3 support the district court's decision that the sale of the property does not automatically terminate the agreement; instead, the decision to terminate by rea-

son of those transfers rests solely with Parkside.

## IV.

▮ ASD may also not resort to equitable arguments to recover against Parkside. For instance, it argues that Parkside has refused to perform the contract and that its actions constitute "anticipatory breach of the contract or repudiation under Tennessee law." As the Tennessee Court of Appeals explained:

> [i]n order to serve as an anticipatory breach of contract or repudiation, the words and conduct of the contracting party must amount to a total and unqualified refusal to perform the contract. In the alternative, a party may breach a contract by committing a voluntary act which renders the party unable or apparently unable to perform the contract.
>
> Whether the words and/or actions of the contracting party have risen to the level of repudiation is normally a question of fact to be determined by the trial court.

*Wright v. Wright,* 832 S.W.2d 542, 545 (Tenn.Ct.App.1991) (citations omitted). The second Restatement of Contracts provides:

> § 250. When A Statement Or An Act Is A Repudiation
>
> A repudiation is
>
> (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243. or
>
> (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

Restatement (Second) of Contracts § 250 (1981).

Parkside has not committed "a breach that would of itself give [ASD] a claim for damages" nor will it so long as it decides not to terminate the agreement. Moreover, the contract contemplates Parkside's ability to sell the property—and, presumably, not complete the project—without terminating the contract. If Parkside has thus far only done what the contract allows it to do, *ipso facto* it cannot be charged with breaching or repudiating the agreement.

▮ ASD also argues in broad language about the good faith of the parties in this case, but does not develop the concept in application to this case. "In Tennessee, the common law imposes a duty of good faith in the performance of contracts." *Wallace v. Nat'l Bank of Commerce,* 938 S.W.2d 684, 686 (Tenn.1996). As *Wallace* notes. "[i]t is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable." *Id.* at 686 (citations and quotation marks omitted).

ASD should find no harbor in good faith or other equitable claims. It has received, thus far, a portion of the total fee it would have received for managing this project—approximately $227.000. It has fulfilled its duties, but it has not completed all the duties assigned to it under section 5 of the contract, if for no other reason than those duties would not begin until construction was underway. In effect, ASD seeks the full development fee as compensation for Parkside's termination of the contract,

even though ASD has not yet performed all the actions contemplated in consideration of that fee. This is not only highly inequitable, but it also essentially transforms the 6% fee into a liquidated damages provision disfavored under Tennessee law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 98 (Tenn.1999) ("Tennessee law disfavors the enforcement of a liquidated damages provision when the provision serves only to penalize the defaulting party for a breach of contract.").

■ Finally, ASD can find no solace through claims against Parkside for causing supervening frustration. As the Second Restatement of Contracts explains:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265. Here section 4.2 of the contract specifically contemplated the sale of the property, which is the "frustration" ASD complains about, without the termination of the contract. Therefore, there was no "basic assumption" upon which ASD may rest its argument.

### V.

"Tennessee courts will not rewrite contracts just because they are ill advised or the parties miscalculated future events." *Wilson v. Scott*, 672 S.W.2d 782, 786 (Tenn. App.1984). In this case, ASD entered into a contract which included language that plainly gave Parkside the authority to suspend the project without giving rise to contractual penalties.

For the reasons given above, we affirm the judgment of the district court.

GILMAN, Circuit Judge, dissenting.

I disagree with the majority's decision in this case because I believe that the disputed contract provision is ambiguous. Under Tennessee law, the interpretation of a contract provision ultimately deemed ambiguous by the court is a question of fact that must be submitted to a jury. And even if the provision at issue were not deemed ambiguous, I believe that the facts as set forth in the complaint state a legal basis upon which relief may be granted. I would therefore reverse the district court's decision to grant Parkside's motion to dismiss and remand the case for further proceedings.

### I. Is the disputed contract provision ambiguous?

The Tennessee Supreme Court has explained that "[a] court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn.2002). "A contract is ambiguous ... when it is of uncertain meaning and may fairly be understood in more ways than one." *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975). If the language is ambiguous, then "a court applies established rules of construction to determine the parties' intent. Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact appropriate for a jury." *Planters Gin Co.*, 78 S.W.3d at 890 (quotation marks omitted) (modification in original).

In the present case, the disputed contract provision (Section 4.2) states in pertinent part:

[T]his Development Agreement shall terminate, solely at Owner's election in its sole discretion, upon the happening of . . . the sale or other transfer of all or substantially all of the Property. Such election to terminate this Development Agreement shall be made by written notice from Owner to Development Manager.

The majority opinion adopts one possible meaning of this provision, which is that "the sale of the property does not automatically terminate the agreement; instead, the decision to terminate by reason of those transfers rests solely with Parkside." Maj. Op. at 895–96. In other words, "written notice from Owner to Development Manager" is a *condition precedent* to the termination of the agreement.

Another reasonable way to interpret the provision, however, as advocated by ASD, is to read the first and second sentences independently. Under this approach, the first sentence states the condition upon which the agreement terminates ("upon the happening of . . . the sale or other transfer of all or substantially all of the Property"). The second sentence then imposes an independent duty upon Parkside to give ASD written notice of its decision to sell or transfer the property. This interpretation is consistent with the language in the second sentence stating that "[s]uch election to terminate this Development Agreement shall be made by written notice . . . ." If the parties had intended written notice to be a condition precedent to the termination of the agreement, they presumably would have written the second sentence this way: "Termination of this Development Agreement shall occur only upon written notice from Owner to Development Manager."

Both interpretations find support in other provisions of the contract. As the majority opinion points out, the disputed provision. Section 4.2, also states that "[t]his Agreement shall automatically terminate upon the sale or transfer of all of the ownership interests of Carl Raff. . . ." Maj. Op. at 894–95. The fact that the parties used the phrase "automatically terminate" in regard to a sale by Carl Raff but not in regard to a sale by Parkside suggests that a sale by Parkside does not by itself terminate the agreement. On the other hand, as discussed above, the disputed provision states that Parkside's election to terminate the agreement *"shall be made by* written notice." (Emphasis added.) If the parties had intended this to mean "termination shall occur *only upon* written notice." they certainly knew how to say that. The preceding sentence, after all. states that "this Development Agreement shall terminate . . . *upon the happening of* . . . the sale or other transfer of all or substantially all of the Property." (Emphasis added.) Thus, the text of the contract as a whole does not definitively support either interpretation.

Under Tennessee law, "[a]n interpretation which gives reasonable meaning to all of [the contract's] provisions will be preferred to one which leaves a portion of the writing useless, meaningless, or inexplicable." *In re Pyramid Operating Authority, Inc.*, 144 B.R. 795, 814 (Bankr. W.D.Tenn.1992). The majority opinion asserts that ASD's interpretation of the disputed provision "renders the clause 'solely at Owner's election in its sole discretion' a nullity, or makes it a nonsensical reaffirmation that Parkside retained the right to sell the property and/or alter its corporate form." Maj. Op. at 895. But the majority appears to overlook the legal effect of the "sole discretion" part of the clause, which is that Parkside's decision to sell or transfer the property does not constitute a breach of either the contract or the implied covenant of good faith and fair dealing. The clause is thus neither a nullity

nor nonsensical. Furthermore. I believe that the interpretation adopted by the district court violates the rule of contract interpretation set forth in *In re Pyramid Operating Authority* because it "leaves a portion of the writing ... inexplicable." Common sense suggests that ASD did not intend to allow Parkside to sell the property and then escape all liability by simply refusing to provide ASD with written notice of the sale. The district court's interpretation therefore leaves the entire termination provision inexplicable.

In conclusion, the disputed contract provision is ambiguous because it "is of uncertain meaning and may fairly be understood in more ways than one." *Farmers–Peoples Bank,* 519 S.W.2d at 805. The "established rules of construction" cannot resolve the ambiguity because both possible interpretations are supported by some parts of the contract but potentially conflict with others. *See Planters Gin Co.,* 78 S.W.3d at 890. Because "ambiguity remains after the court applies the pertinent rules of construction," the meaning of the disputed provision is "a question of fact appropriate for a jury." *Id.* The district court therefore erred by disposing of this case upon the defendants' motion to dismiss.

## II. Assuming that the disputed provision is not ambiguous, should the district court have granted the motion to dismiss?

As the previous discussion demonstrates. I believe that the district court's interpretation of the disputed contract provision is incorrect. Even assuming, however, that the district court correctly decided that the contract is not ambiguous, dismissal was still not appropriate because the facts as set forth in the complaint state a legal basis upon which relief may be granted.

As discussed above, under the district court's interpretation, "written notice from Owner to Development Manager" is a condition precedent to the termination of the agreement. Termination, in turn, is a condition precedent to Parkside's duty to pay ASD the full 6% of development costs pursuant to Section 7.2 of the contract. Written notice, according to the district court, is therefore a condition precedent to Parkside's duty to pay the full 6%. But "[i]t is basic contract law that a party who prevents the occurrence of a condition precedent may not stand on that condition's non-occurrence to refuse to perform his part of the contract." *Swaback v. American Information Technologies Corp.,* 103 F.3d 535, 542 (7th Cir.1996) (citing Restatement (Second) of Contracts § 225, cmt. b (1981)).

This rule is similar to the equitable maxim that "equity regards as done that which ought to be done in fairness and good conscience," which "means that equity will treat the subject matter, as to collateral consequences and incidents, in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been." 27A Am.Jur.2d Equity § 116 (1996). In the present case, Parkside has unreasonably prevented the occurrence of the ministerial condition precedent by failing to provide ASD with written notice of the sale of the property, the sale clearly being the substantive event that terminated the contract. Parkside should therefore not be allowed to rely on the ministerial condition's nonoccurrence as a basis to refuse to pay ASD the balance of the 6% fee.

## III. Are the damages sought by ASD part of an unenforceable penalty clause?

One final issue is whether the damages that ASD seeks are valid liquidated dam-

ages or an unenforceable penalty. The majority opinion points out that "ASD seeks the full development fee as compensation for Parkside's termination of the contract, even though ASD has not yet performed all the actions contemplated in consideration of that fee." Maj. Op. at 897. The Tennessee Supreme Court has held that, in deciding whether a liquidated-damages provision is enforceable, a court must consider

> the intentions of the parties based upon the language in the contract and the circumstances that existed at the time of contract formation. Those circumstances include: whether the liquidated sum was a reasonable estimate of potential damages and whether actual damages were indeterminable or difficult to measure at the time the parties entered into the contract.

*Guiliano v. Cleo, Inc.,* 995 S.W.2d 88, 100–01 (Tenn.1999). We are not in a position to assess these factors without an adequate factual record. This case should therefore be remanded to the district court, where the parties would be able to develop the relevant evidence.

## IV. Conclusion

For all of the reasons set forth above, I would reverse the district court's decision to grant Parkside's motion to dismiss and remand the case for further proceedings.