John BRUNGARD and Peggy Brungard, P/K/A Peggy Cole, Plaintiffs–Appellees,

v.

CAPRICE RECORDS, INC., Roe Lewis, and Charles "Chuck" Adams, Defendants–Appellants.

Court of Appeals of Tennessee, Middle Section.

Sept. 10, 1980.

Certiorari Denied by Supreme Court Nov. 24, 1980.

Rose Palermo and Abby R. Rubenfeld, Cheatham & Palermo, and Lawrence Wilson, Nashville, for plaintiffs–appellees.

H. McKinley Marlow, Jr., and Jack Green, Nashville, for defendants–appellants.

## OPINION

DROWOTA, Judge.

This case involves fraud in the inducement and the Tennessee Consumer Protection Act of 1977, T.C.A. § 47–18–101 et seq.

On July 20, 1978, the plaintiff–appellee, Peggy Brungard, filed suit against the defendants, Caprice Records, Inc., Roe (Don) Lewis and Charles (Chuck) Adams, alleging that the defendants induced her to enter into a recording contract with Caprice by means of fraudulent misrepresentations. The case was tried before the Chancellor on June 27, 28 and 29, 1979. In a memorandum opinion dated July 13, 1979, the Chancellor, after making extensive findings of

fact and conclusions of law, found for the plaintiff. He rescinded the contract between plaintiff and Caprice, and awarded plaintiff treble damages and reasonable attorney's fees under the Tennessee Consumer Protection Act of 1977, T.C.A. § 47–18–101 et seq. The defendants have appealed from this judgment.

Caprice Records, Inc., a Tennessee corporation maintaining its principal place of business in Nashville, Tennessee, is primarily in the business of producing custom records. A custom record company sells record production services. It is a means by which nearly anyone, regardless of talent or likelihood of musical success, can make a record.

The market for these services primarily consists of unknown, aspiring singers or artists. The artist at the outset pays the recording company to produce the record. The production services provided by the company include musicians, vocalists, studio time, tape, mixing, mastering, and a producer. The contract price paid by the artist also includes the cost of manufacturing the record discs.

The promotional services provided by the company are minimal and clearly insufficient to produce a commercially successful record. The public success of its records, however, is not essential to a custom record company. Its income and profits are derived from the sale of production services, not from the sale of records.

By way of contrast, the vast majority of records are produced by means of a standard contract between the artist and the company. The standard contract is a risky venture from the viewpoint of the company. The recording company pays all the costs of producing and manufacturing the record. It also bears the cost of promotion and marketing which are essential to the success of any record. If a record fails, the record company, not the artist, bears the loss. Only if the public buys the record can the company recoup its investment.

Caprice Records has a very few artists under standard contracts. The bulk of its business is derived from custom records. Caprice contacts potential customers of its custom record services by means of advertisements on radio and in newspapers in regions of the country where country music is popular. In August, 1977, plaintiff, who lived in Albuquerque, New Mexico at that time, answered such an advertisement. She visited a local motel with her husband where she auditioned for defendant Chuck Adams, a Caprice Records talent scout. While there, she filled out one of Caprice's confidential audition forms. Adams told plaintiff that if she was accepted by Caprice, she would be given a contract to record in Nashville. The next day, Adams called plaintiff to inform her that Caprice had accepted her. Plaintiff, her husband and Adams again met to discuss the arrangement. During both meetings, Adams made numerous misrepresentations concerning Caprice and its relationship with plaintiff. According to the Chancellor's findings, the tenor of these representations was that Caprice intended to actively promote and finance the plaintiff's record, as it would any other record under a standard contract. These misrepresentations will be discussed in detail below.

Plaintiff did not sign the contract until October, 1977. At that time, she mailed a signed contract and $500.00 to defendant Don Lewis, president of Caprice Records. The contract was a custom records agreement of the type discussed earlier. It required plaintiff to pay Caprice $2,966.00 for which Caprice would produce a record cut by the plaintiff. Caprice agreed to manufacture 500 records. Plaintiff and Caprice were to receive 100 records each. Caprice's only obligation in the promotion of the record was to send the remaining 300 records to radio stations around the country.

In late October, 1977, plaintiff came to Nashville and recorded two songs in a Nashville studio. The record was then pressed and released on the Checkmate label. When plaintiff received her 100 copies, she detected a distortion on one side. After complaining to Lewis, 100 additional copies were pressed and sent to her at no charge. Around this time, plaintiff also discovered that Caprice was not promoting her record

as she had understood it would. She ordered 500 more records which she attempted to sell on her own "to make the best of a bad situation." The instant lawsuit followed shortly thereafter.

Appellants have presented six issues for review. The first two issues concern the parol evidence rule. The Chancellor admitted testimony concerning the first meeting between plaintiff and Adams in Albuquerque in August, 1977. He also admitted a taped recording of the second meeting held a few days later. Both meetings took place prior to the signing of the contract. Appellants assert that this was parol evidence and that the Chancellor erred by permitting its introduction in contradiction of the written agreement between the parties.

Appellants misconceive the nature of the allegations against them. Plaintiff is not bringing suit on the contract. She is asking for a recission of the contract on the grounds that appellants fraudulently induced her to enter into the contract. She seeks damages on the tort theory of fraudulent misrepresentation. The law is well settled in this area.

The Parol Evidence Rule applies to suits on a contract. It has no application to a case involving a fraudulent misrepresentation which induces the contract.

*Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228, 231 (Tenn.App.1977). On this basis we hold that the Chancellor properly admitted and considered the testimony and tape recording of plaintiff's meetings with Adams.

In issues three, five and six, the appellants generally assert that the evidence is insufficient to support the Chancellor's findings that the plaintiff was fraudulently induced to enter into the contract.

In all civil actions tried by a court of record without a jury, review of the findings of fact by the trial court shall be de novo upon the record, accompanied by a presumption that the judgment of the trial court is correct, unless the preponderance of the evidence is otherwise. T.C.A. § 27–303, TRAP 13(d). The Chancellor made extensive findings of fact. After reviewing the Chancellor's findings and the record, we find that the evidence supports the Chancellor's judgment.

The plaintiff is suing on the tort of false misrepresentation in a commercial transaction. Under this theory,

One, who in the course of his business, profession or employment, or a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon such information *if he fails to exercise reasonable care or competence in obtaining or communicating the information.*

*Jasper Aviation, Inc. v. McCollum Aviation, Inc.,* 497 S.W.2d 240, 242 (Tenn.1972) (emphasis added). In effect, the scienter requirement of common law deceit has been replaced by a reasonable care standard in business transactions. *Haynes v. Cumberland Builders, Inc., supra* at 232. Thus the plaintiff only needs to prove that the misrepresentations were made negligently. Nevertheless, the facts indicate that the misrepresentations were fraudulent in that the defendants made them "(1) knowingly or (2) without belief in their truth, or (3) recklessly, careless whether they be true or false." *Tartera v. Palumbo,* 224 Tenn. 262, 453 S.W.2d 780 (1970); *Shwab v. Walters,* 147 Tenn. 638, 251 S.W. 42 (1923). Although proof of actual fraud is not necessary to establish liability in this case, it is important with regard to the amount of damages to be awarded.

The evidence of the two meetings between plaintiff and Adams indicates that the defendants induced the plaintiff into signing a custom record contract by means of numerous false representations designed to convince the plaintiff that Caprice was taking a financial risk in signing her to a recording contract and that it would actively promote her record. At their first meeting Adams told the plaintiff that Caprice would invest $3,000.00 in her record, and she would invest $2,966.00. This statement

was flatly untrue. Adams knew that Caprice invested none of its own money in a custom record and that it would not put up its own money for the plaintiff. At the next meeting, Adams reminded the plaintiff that "our money's at stake." When the plaintiff pressed Adams about Caprice's $3,000.00 commitment in the venture, Adams hedged by saying "well, whatever." He then said that Caprice would pick up all expenses above her initial investment. Again, Adams knew there were no expenses above plaintiff's $2,966.00.

These misrepresentations misled the plaintiff into thinking that Caprice would make a financial commitment to promote her record. The plaintiff had a ninth grade education. She had sung professionally in local clubs in the Southwest under the name of Peggy Cole. Although unsophisticated in her knowledge of the recording industry, she had enough experience to know that for a record to be even marginally successful required a promotional effort by the recording company. She also knew that her investment would cover only the production and manufacture of the record. She relied on Caprice based on Lewis's statements to commit its resources to adequately promote her record.

Other misrepresentations regarding Caprice Records itself followed. At their first meeting, Adams told the plaintiff that Caprice's business was selling records. In fact, for the fiscal year ending February 28, 1978, Caprice's record sales accounted for $1,036.89 out of a gross income of $761,-644.26. The sale of production services to artists such as the plaintiff accounted for $755,401.74. By misrepresenting the nature of Caprice's business, Adams misled the plaintiff into believing that Caprice depended for its income on the promotion of the records of artists, such as plaintiff, that Caprice accepted and signed.

Adams also told plaintiff that Caprice was a publicly owned stock company and that its president, Don Lewis, enjoyed good relations with the Board of Directors. Caprice Records is owned by two shareholders. Lewis, as founder, president and 85% share-holder, understandably enjoys good relations with the Board of Directors. By falsely characterizing Caprice in this manner, Adams conveyed the impression that Caprice was a large company with extensive resources at hand for the promotion and distribution of its records. Moreover, plaintiff, though unsophisticated in these matters, correctly surmised that if Caprice was publicly owned, then it would be subject to some type of governmental oversight.

At both meetings, Adams showed plaintiff a brochure in which Caprice announced plans to build Music World, a mammoth music and entertainment complex that would include a "3500 seat auditorium which will primarily be used to expose new artists and entertainers." The plans to build Music World were discontinued a year before Adams gave the brochure to plaintiff. By using this brochure, Adams again misrepresented to the plaintiff that Caprice was a large recording company with substantial assets sufficient to build a huge music complex and that Caprice's assets were to be employed in the promotion of new artists such as plaintiff.

At the second meeting, Adams read the contract to the plaintiff. He summarized paragraph seven of the contract by telling her that all it did was give Caprice the right to publicize the plaintiff's record. The summary and the contract itself misrepresented Caprice's intention, since Caprice did not intend to publicize the record. The summary also misrepresented the contents of paragraph seven. Paragraph seven also gave Caprice the right to release plaintiff's record "under its name [Caprice] and/or any other names which, from time to time may be selected." Caprice has a few standard recording artists. These artists record on the Caprice label, giving that label at least minor recognition in the music industry. Caprice released plaintiff's record under the Checkmate label. The Checkmate label is unknown in the industry. The evidence indicated that a record has a much greater chance of being played, or even listened to, by radio stations if it is on a known label.

By misrepresenting the contents of paragraph seven, Adams bolstered the false impression that plaintiff was recording for a recognized recording company on a known label.

There were other misrepresentations of fact and existing intention. In his memorandum the Chancellor describes the effect of the entire presentation to plaintiff.

> The entire presentation of Caprice to this plaintiff was designed to leave her with a false impression of the character of the transaction. In this production of a custom record, the plaintiff assumed all financial risks and paid all expenses. All she received was a record. Caprice intentionally mislead her into believing that the transaction was something else—one in which the record company was taking a financial risk, had a financial interest in whether the record was a success, and one in which it would promote her record.

■ Under Tennessee law, misrepresentations must be of an existing or past fact, not of an opinion or conjecture as to future events. *Edwards v. Travelers Insurance of Hartford, Conn.*, 563 F.2d 105 (6th Cir. 1977), and cases there cited. As the preceding discussion indicates, the defendants made numerous misrepresentations with regard to the business of Caprice and its financial and corporate structure. These misrepresentations were material and were relied on by plaintiff in entering into the contract with Caprice. On this basis alone, plaintiff has proved her case.

The defendants also made several misrepresentations to the effect that they would promote and finance plaintiff's record. Tennessee has long held the minority view that an action for fraud will not lie for representations or promises that something will be done in the future, even though the promise was made without the present intention to keep it. *A. Landreth Co. v. Schevenel*, 102 Tenn. 486, 52 S.W. 148 (1899). Recent cases, however, indicate that this view is giving way to the majority rule recognizing an action for promissory fraud. In *Bolan v. Caballero*, 220 Tenn. 318, 417 S.W.2d 538 (1967), the court upheld the old

Tennessee rule, but indicated that it would consider the majority rule "in a proper case where justice demands . . . ." *Id.* at 326, 417 S.W.2d 538. It is perhaps significant that in *Bolan*, the court found that no fraudulent promises had been made.

The current Supreme Court in *Fowler v. Happy Goodman Family*, 575 S.W.2d 496 (1978), recognized the trend towards the majority rule and went on to judge the facts before it according to this rule. The court held, however, that the party alleging promissory fraud had failed to produce sufficient evidence to support its claim. As a result, the court had no opportunity to explicitly adopt the majority rule.

■ It is apparent from these cases that the Tennessee Supreme Court will adopt the majority rule if the party alleging promissory fraud produces evidence supporting the allegation. The evidence in the instant case supports such an allegation. Plaintiff's recovery therefore can be predicated on misrepresentation of a material existing fact and on misrepresentation of intention or promissory fraud.

In appellants' fourth issue, it is asserted that the Chancellor erred in finding liability on the part of Lewis and Adams, regardless of the liability of Caprice. The basis for this contention is that an officer or agent of a corporation is not liable on the contracts of the corporation, unless so stipulated. This contention is wholly without merit.

■ Plaintiff is suing Adams in tort, not on the contract. It is settled law that an agent cannot escape liability for tortious acts, including fraud or misrepresentation, against third persons simply because the agent was acting within the scope of the agency or at the direction of the employer. *Howard v. Haven*, 198 Tenn. 572, 281 S.W.2d 480 (1955); *Scott v. Burton*, 173 Tenn. 147, 114 S.W.2d 956 (1938). Adams made nearly all of the misrepresentations and he is therefore liable.

■ An officer or director of a corporation who commits or participates in the commission of a tort is likewise liable to third parties regardless of the liability of a

corporation. *Cooper v. Cordova Sand and Gravel, Inc.*, 485 S.W.2d 261 (Tenn.App. 1971). Defendant Lewis created Caprice Records and its method of attracting customers for its production services. Lewis applied the term "talent scout" to his salesmen, even if, as in the case of Adams, the so–called talent scout was a former insurance salesman with no musical background. Lewis authorized the use of a confidential audition form to be filled out by the potential customer. At trial, Lewis could not justify the need for confidentiality. By employing such terms as "confidential" and "talent scout," Lewis misled potential customers into thinking that Caprice, like the standard record companies, was being selective in discovering· new talent and that it wished to hide this talent from other record companies. More importantly, Lewis created the misleading brochure and authorized its use after the plans for Music World were discontinued. Considered in their entirety, these facts indicate that Lewis knew and approved of the selling methods employed by Adams and that Lewis participated in the fraud.

The Chancellor awarded the plaintiff treble damages and reasonable attorney's fees under the Tennessee Consumer Protection Act of 1977, T.C.A. § 47–18–101 et seq. The Act declares unlawful deceptive or unfair trade practices. T.C.A. § 47–18–104(a). Specifically mentioned as unlawful are representations to consumers that "services . . . have characteristics, . . . uses, benefits, or qualities that they do not have" (T.C.A. § 47–18–104(b)(5)), representations that "services are of a particular standard, quality, or grade" (T.C.A. § 47–18–104(b)(7)), and representations that "a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve" (T.C.A. § 47–18–104(b)(12)). The fraudulent misrepresentations of the defendants violated each of these provisions.

T.C.A. § 47–18–109 confers a private right of action on an individual who suffers an ascertainable loss as a result of an unlawful practice under the Act. A plaintiff's

recovery is normally limited to actual damages and reasonable attorney's fees, but if the violation was willful and knowing, the court may award treble damages. The evidence in this case overwhelmingly supports the Chancellor's finding that the deceptive practices were willful and knowing. On this basis, the award by the Chancellor of $7,998.00 in treble damages and $2,666.00 in attorney's fees is affirmed. We also affirm the Chancellor's decision to rescind the contract between plaintiff and Caprice.

Affirmed.

SHRIVER and LEWIS, JJ., concur.