**Tom B. WILSON, Plaintiff-Appellant,**

**v.**

**G.T. SCOTT, Jr., and U. Grant Browning, Defendants-Appellees,**

**and**

**Westminster Company, Defendant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 27, 1984.

Application for Permission to Appeal
Denied by Supreme Court
May 21, 1984.

Raymond G. Prince, Smith, Prince & Takacs, Hendersonville, for plaintiff-appellant.

Don L. Smith, Manier, White, Herod, Hollabaugh & Smith, P.C., Nashville, for defendants-appellees.

OPINION

LEWIS, Judge.

Plaintiff Tom W. Wilson [1] and defendants G.T. Scott, Jr. and U. Grant Browning were involved in several real estate development projects. This suit concerns the distribution of proceeds from the sale of a particular project located in Greenville, South Carolina. The parties had signed an agreement that specified each person's portion of the proceeds of this project, but plaintiff alleges that the trial court misconstrued the agreement or, in the alternative, that because the project could not be developed as the parties originally intended there was a "failure of consideration and the non-occurrence of a condition precedent to payment of any of the parties under the agreement" and the agreement was void.

Scott and Browning had been partners in real estate development for several years. Over the years they had each developed their own areas of specialty; Browning handled projects financed by private funds and Scott handled projects financed by government funds. Frequently each would work in his own area without direct help from the other partner but the project was still part of the Scott and Browning partnership.

In 1976, Browning introduced Scott to the owner of real estate suitable to development of multi-family housing in Greenville. Scott began to develop a moderate

---

1. During many of the events in this suit Tom B. Wilson acted on behalf of Tom B. Wilson, Inc., a dissolved Tennessee corporation, of which he was the sole shareholder and is the successor in interest. Wilson brought this suit as an individual and will be referred to as such in this opinion. Parties will be referred to by their last names or as referred to in the court below.

and low income housing project that would require the approval and support of the U.S. Department of Housing and Urban Development (HUD). He obtained an option to purchase the property, notification of approval of a final proposal by HUD under Section 8 of the National Housing Act, and a conditional commitment for mortgage insurance. He also began financial arrangements, negotiations for construction contracts, arranged for an approved architect, and generally got the project rolling. Browning had nothing to do with the project beyond the original site selection.

Scott originally intended to finance the project through the Government National Mortgage Association. However, those funds were unavailable in 1978 and Scott's mortgage broker suggested he contact Wilson at Provident Trust to arrange bond issue financing.

Wilson worked as a mortgage broker at Provident Trust and received a commission on all mortgages he arranged. He had been in this business since 1971 and had been working in tax free bond issue financing for approximately six (6) months when Scott contacted him. He testified that he did have general knowledge of the processing procedures, stages of applications, and negotiations with HUD necessary to complete a project from previous multi-family projects.

When Scott contacted Wilson, the option to purchase had expired and Scott had an oral commitment from the property owners that he could extend the option for $2,500.00. Scott was unsure the bond issue financing would work and expressed uncertainty about whether to invest more money to keep the option alive. Wilson offered to pay the $2,500 extension fee if he could be a partner in the project. Scott, Browning, and Wilson entered into an agreement on March 1, 1978, which provided, in part:

WHEREAS, Scott and Browning as sponsors have obtained a notification of approval of final proposal dated August 12, 1977 under Section 8 of the National Housing Act covering a proposed multi-family rental project for 156 units known as Crestwood Forest Apartments and a conditional commitment for mortgage insurance covering the same project all bearing FHA No. 054–35366PML8SC16–0056–001 (said apartments being hereinafter referred to as the "Project");

WHEREAS, the parties desire to enter into an agreement concerning the development of said Project and the securing of financing for the same;

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the parties hereto agree as follows:

1. The parties will use their best efforts to obtain an extension of the option for the land to be utilized by the Project and Wilson will pay the necessary extension fee in the amount of $2,500.00.

2. The $2,500.00 extension cost paid by Wilson and any and all fees to FHA and advanced costs previously paid by Browning and Scott shall be refunded to the parties at initial closing.

3. Browning and Scott shall be paid for their services and efforts in connection with the Project as a consultant fee an amount equal to two percent (2%) of the mortgage proceeds or amount of bond issue utilized in financing the Project less the amount of debt reserve for one year.

4. The fee of Scott and Browning shall be paid in the amount of $50,000.00 in cash at initial closing and the balance in the form of a Note from the limited partnership or other entity formed to develop the Project, which Note shall be due and payable on January 15, 1979 and bearing eight percent (8%) interest on the unpaid balance.

5. Scott and Wilson agree that they will expend their best efforts and such amounts of their time as reasonably necessary to obtain financing for construction of the Project, permanent financing, and equity funds to be obtained by syndication. Scott and Wilson agree that they will receive and divide all funds from the sale of the Project or any syndication of

the equity of the same on an equal basis between them. All losses shall be shared equally. Browning agrees that he will not share in these funds, nor will he have any further responsibilities with regard to the Project. The parties shall not be liable to each other for the return of any fees or costs advanced such as the $2,500.00 advanced by Wilson or the FHA fees or costs previously advanced by Scott and Browning.

The project did not fare well. A group of homeowners whose property was adjacent to the proposed site protested at a city council meeting. They influenced local officials not to issue building permits and not to issue bonds for financing. The building permits were eventually issued after several lawsuits. The bonds Scott and Wilson had hoped would finance the project were never issued. Because of the need of money to defend the lawsuit, to secure a construction loan, and to provide enough liquidity to obtain final HUD approval, Kaufman and Broad Asset Management (KBAM) was brought into the project in a "Joint Venture" agreement dated June 7, 1978.

KBAM and its resources solved the pressing problems of the project. The project developers won the initial lawsuits and successfully defended their victory in the appellate courts of South Carolina. Wilson left his employment at Provident Trust and Scott and Wilson formed a general partnership known as the Scott and Wilson Company in January or February of 1980. They continued to work on the Greenville project as well as several other projects. In April, 1980, HUD renewed its mortgage commitment but informed Scott that when that commitment expired on June 11, 1980, HUD would not again renew its commitment. On May 1, 1980, KBAM accused Scott and Wilson of breaching the Joint Venture agreement of June 7, 1978, demanded the return of all sums expended by KBAM, and withdrew from the joint venture.

The Scott and Wilson Company partnership was terminated in mid-May.

At this point, the only way to salvage any profit from the project was to sell the project or at least KBAM's interest. HUD had indicated it would approve Westminster Company (Westminster) and Scott sold the entire project without Wilson's authorization or approval. Scott received $94,727.80 from Westminster. There remained $87,339.06 after Scott returned Wilson's $2,500, paid fees to various mortgage bankers, including a fee to Provident Trust from which Wilson was paid $6,000, and reimbursed himself and Browning for expenses. Scott then divided the $87,339.06 between himself and Browning under paragraph 3 of the March 1, 1978 agreement, under which they were to receive two percent (2%) of the mortgage. Scott used the mortgage commitment of $4,456,700 obtained from HUD in April, 1980 even though that amount was subject to change because there were still negotiation about the sidewalks and elevators between the developers and the department officials.

Wilson filed suit against Scott, Browning, and Westminster seeking one third of the proceeds of the sale of the project to Westminster and an injunction to prohibit Westminster from distributing further monies to Scott and Browning. The Chancellor granted a temporary restraining order to prevent distribution of funds, but Westminster was later dismissed from the suit because it had already disbursed the funds to Scott and Browning. After a hearing the Chancellor found that Wilson, Scott, and Browning had entered a partnership agreement to develop multi-family housing in Greenville, South Carolina; that the project was delayed because local officials illegally refused to grant building permits; that Wilson and Scott successfully challenged the denial of permits in South Carolina courts; that KBAM was brought in because of the expense and delay but then left the joint venture and insisted on a sale of the project; that Scott sold the project to Westminster, refunded $2,500 to Wilson, paid expenses, and divided the remainder with Browning. The Chancellor also found that:

[t]he partnership agreement between the plaintiff and defendants provides that upon initial closing of the sale of the completed project, certain fees would be refunded and Browning and Scott would be paid a percentage of the mortgage proceeds for their services. After these expenses are paid, Scott and Wilson would divide any remaining funds equally between them. All losses would be shared equally between Scott and Wilson.

The agreement is silent with respect to a termination of the undeveloped project prior to the "initial closing" contemplated in the agreement.

However, the Chancellor held that Wilson was not entitled to the proceeds under the agreement, that he could have foreseen that the project might be abandoned prior to completion, and had he desired a different distribution of proceeds in that situation it could have been included in the agreement.

■ Plaintiff first argues that "[i]f the agreement of March 1, 1978 is deemed to be in existence, Wilson is entitled to receive one-half of the net proceeds of sale." The plaintiff argues that paragraph 3 of the agreement applies only to financing by tax-free bonds because the words, "less the amount of debt reserve for one year," apply only to bond financing situations. We agree that those words apply only to bond financing situations and that they determine how much of the total amount of any bond issue would be used in determining the two percent (2%) consultant fee of Scott and Browning. However, this argument ignores the fact that paragraph 3 specifically says "two percent (2%) of the *mortgage proceeds or* amount of bond issue." (emphasis added) The plain reading of this language is that either a mortgage or a bond issue is to be subject to a two percent (2%) consultant fee. There is no indication in the testimony that "mortgage" is synonymous with or is another term for bond issue. This argument is without merit.

Plaintiff also argues that since there was no bond financing for the project and Scott and Browning are not due any remuneration under paragraph 3 that we should look to paragraph 5 to determine the distribution of the proceeds. He asserts that paragraph 3 and paragraph 5 are repugnant because paragraph 3 refers to a specific event which did not occur and paragraph 5 refers "generally to the sale or any syndication of the project." However, we find that paragraph 3 is concerned with the method of determining a consulting fee and paragraph 5 is concerned with the distribution of whatever proceeds from either a syndication or sale were left after payment of expenses as enumerated in paragraphs 2, 3, and 4. Therefore, we find the paragraphs are not repugnant and that plaintiff is not due fifty percent (50%) of the proceeds of the sale to Westminster under the contract.

■ Plaintiff also asserts that the agreement of March 1, 1978, is void because the "inability of the partnership to develop the project as contemplated in the agreement constitutes both a failure of consideration and the non-occurrence of a condition precedent." Plaintiff wants us to declare the agreement void and then divide the payment Scott received from Westminster under Tennessee partnership law.

Plaintiff's argument that the inability to develop the project to completion constitutes a failure of consideration is without support. The cases cited are wholly inapplicable to this situation. In *Smith v. Rankin*, 12 Tenn. (4 Yerg.) 1 (1833), there was a contract in which the defendant was to perform work for plaintiff after plaintiff delivered his good-will and right of position to vacant land. The Court held that "a bargain concerning unoccupied public lands is wholly void. . . ." *Id.* at 3. That was a different situation than the one before this Court: In *Rankin* there was no consideration from the beginning; here, there were mutual promises between Scott and Wilson, monetary investments by Scott and Wilson, and a promise by Browning to give up all future rights to payment in a project in which he had at one time had a right to receive fifty (50%) percent of the proceeds.

In *Farrell v. Third National Bank in Nashville*, 20 Tenn.App. 540, 101 S.W.2d 158 (1936), plaintiff and her six brothers executed trusts which provided for each others' children and grandchildren if none to the trustor's children or grandchildren survived. The trust instrument specifically said that it was executed in consideration of substantially similar trusts being executed by the other siblings. One of the trusts was declared void under New York law. The court held that there was a partial failure of consideration and allowed revocation of the trust. Again, the *Farrell* facts are not parallel with the facts before this Court. In *Farrell*, the plaintiff executed the trust only because her brothers executed similar trusts. The inability to complete the development of the project means that the parties were unable to effectuate the best and most profitable possible end to their venture. That is not the same thing as failure of consideration.

Plaintiff is also incorrect in asserting that there was a failure of a condition precedent. In *Real Estate Management v. Giles*, 41 Tenn.App. 347, 293 S.W.2d 596 (1956), the complainant real estate company sued to determine which defendant, buyer or seller, was entitled to the earnest money on a contract for the sale of land owned by the seller defendant. The contract was contingent upon the purchaser being able to purchase two other properties. Plaintiff refers us to the language of the Court: "[a] conditional contract is a contract whose very existence and performance depends upon the happening of some contingency or condition expressly stated therein .…" *Id.* at 353, 293 S.W.2d at 599. However, this is not a conditional contract: there is no language in the March 1, 1978 agreement that can be construed to be even close to the language in *Giles* that the offer was "contingent upon the buyers being able to purchase [two other tracts]." *Id.* at 350, 293 S.W.2d at 598. This was a contract for uncertain, even speculative, rewards, but that does not make it a contract which will not have effect unless something else occurs.

Tennessee courts will not rewrite contracts just because they are ill advised or the parties miscalculated future events. In *Metropolitan Life Insurance Co. v. Humphrey*, 167 Tenn. 421, 70 S.W.2d 361 (1934), an insured party signed a settlement and release agreement with the insurer because he and his physician expected his disability to be cured. The court was asked to rescind the release agreement on the theory that there was a mistake of fact. The court refused to do so because the mistake was not about a past or present fact, but rather, how far into the future a disability would continue. The court said that it "will not release a person from the consequences of voluntary compromises or speculative contracts made with knowledge of the facts which turn out differently from what was expected." 167 Tenn. at 425–426, 70 S.W.2d at 362. Here, the parties were all experienced businessmen. They miscalculated how their project would be developed and the result of the sale did not meet their expectations. But the main purpose of the agreement was to allocate the proceeds from the sale of the project: paragraphs 2, 3, and 4 indicate fees to be returned and a measure of the consultant fee and its method of payment. The phrase "at initial closing" indicates when the fees are to be refunded, it is not a condition for the refund. Since there was no initial closing, Scott acted reasonably and distributed the proceeds of the sale at a reasonable time. The fact that the contract indicates that there may be a sale or a syndication shows that the parties were uncertain of the ultimate disposition of the project. There is nothing in the contract or in the circumstances of the parties to indicate that this contract was to apply only in the case of a sale of a complete development of the project.

Since we hold that the March 1, 1978 agreement was in effect, it necessarily follows that there was not a violation of T.C.A. § 61–1–139.

The judgment of the Chancellor is affirmed with costs taxed to Wilson and the cause is remanded for the collection of

costs and any further necessary proceedings.

TODD, P.J., and CANTRELL, J., concur.