**DAVID HODGES FARMS, INC., an Arkansas Corporation, Appellant,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee.**

No. 85–2252.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1986.

Decided July 10, 1986.

H. David Blair, Batesville, Ark., for appellant.

Phillip Carrol, Little Rock, Ark., for appellee.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

BRIGHT, Senior Circuit Judge.

David Hodges Farms, Inc. (Hodges Farms) appeals from an adverse judgment[1] dismissing by directed verdict Hodges Farms' action against Prudential Insurance Company for breach of contract, deceit, and negligent misrepresentation. On appeal, Hodges Farms argues that the substantial evidence supported each of its theories of recovery, and, therefore, the district court erred in directing the verdict against Hodges Farms. For the reasons discussed below, we affirm.

## I. BACKGROUND

Hodges Farms is an Arkansas corporation whose stock is held by David Hodges and his wife. In 1981, Hodges Farms owned a one-half interest in a Mississippi farm called Labelle Plantation, with the other one-half interest held by David's brother, Kaneaster Hodges, Jr. The Hodges brothers were also partners in a family law firm.

During 1981, the relationship between David and Kaneaster began to deteriorate, eventually resulting in the dissolution of their law partnership in October. Prior to this time, the Hodges brothers had been negotiating with Howard C. Westmoreland, a representative of Prudential Insurance Company, about the possibility of forming a joint venture with Prudential and the brothers. Under the joint venture, Prudential would buy a one-half interest in Labelle Plantation, and become partners with Kaneaster and Hodges Farms in the operation of the farmland. The parties had not yet put the proposal in writing or submitted it for approval to Prudential's investment committee.

Following the breakdown of the relationship between David and Kaneaster, the parties apparently realized that a joint venture with both brothers participating would not work. Kaneaster began negotiating separately with Westmoreland regarding a joint venture between only Kaneaster and Prudential. Under this proposal, Prudential would hold an eighty percent interest in the joint venture, and Kaneaster would own the remaining twenty percent. The joint venture would acquire Labelle Plantation, including the one-half interest held by Hodges Farms.

The terms of the proposed joint venture were reduced to writing only once, in a letter drafted by Kaneaster's broker following a meeting between the broker, Kaneaster, and Westmoreland on October 19, 1981. The letter outlined the terms of the joint venture, but expressly stated that it "in no way represent[ed] a binding contract," and acknowledged that the proposal remained subject to acceptance by David

---

1. The Honorable George Howard, Jr., United States District Court for the Eastern District of Arkansas.

Hodges. The letter contained provisions for the signatures of Kaneaster and Westmoreland. It contained no provision for David's signature.

The broker sent the letter to Westmoreland, who changed some of the terms, signed the letter and returned it to the broker on October 28, 1981. In the accompanying cover letter, Westmoreland informed the broker that Prudential had "deleted [the joint venture] from our pipeline," but that he had requested that the project "be added back to our backlog." He stated that they should know within a few days whether Prudential had funds for the project. "In the meantime," he wrote, "let's proceed on the basis that we can get it approved."

Kaneaster's broker never showed the modified proposal letter to Kaneaster. At trial, Kaneaster testified that he did not know whether he would term the changes "a counteroffer or whether it's just trying to continue the negotiations." Kaneaster stated that it "would have been hard for me to live with some of the changes [Westmoreland] made."

On the same day that Westmoreland returned the proposal letter to Kaneaster's broker, he met with David regarding the sale of Hodges Farms' interest in Labelle. At this meeting, Westmoreland and David discussed a tentative price for the land, as well as a closing date for the sale. During the meeting, Westmoreland showed David a report that he had sent the previous day to his supervisor in Prudential. In the report, Westmoreland summarized thirteen projects in various stages of negotiation; the joint venture with Kaneaster was listed sixth on the list. Westmoreland wrote in his report that he hoped that Prudential would be able to find money to pursue at least the first eight projects. At the October 28th meeting, however, Westmoreland told David that Prudential would not entertain any new proposals within the next ninety days because of uncertainty over funding.

On October 30, David wrote to Westmoreland confirming the price and closing date discussed in their prior meeting. On November 3, Kaneaster and David informed brokers listing Labelle for sale that they were removing the property from the market. Kaneaster also contacted an area bank to secure a line of credit in anticipation that the joint venture would proceed.

The record reveals that the Hodges brothers were aware throughout these negotiations that any agreement reached by the parties remained subject to the approval of Prudential's investment committee and availability of funding. In late November, Westmoreland notified the brothers through a broker that Prudential had placed a moratorium on investments such as the parties were contemplating. The broker stated that Westmoreland wanted to assure David and Kaneaster, however, that the proposed venture would "be at the top of the list when funds were available." The broker asked the brothers to contact him as to whether they wanted to "call off the negotiations or leave [the] purchase to be approved as soon as funds are available."

David quickly wrote the broker that he wanted "to continue with the agreement made with Prudential Insurance Company concerning its purchase of Labelle Plantation." He continued:

> Mr. Westmoreland indicated to me the only contingency that would prevent Prudential Insurance Company buying Labelle Plantation was having funds available. Based on your letter of November 25, that will cause a delay but I wonder if it is possible for the [Prudential investment] committee to approve the purchase of Labelle Plantation subject to funds being available, or, in the event they discontinue the program, then there would be no obligation on the part of Prudential or, if they on a permanent basis do not have any funds, then they would not be obligated.

> * * * *

> Obviously I am counting on Prudential being back in the market with funds in order to complete the transaction. If

funds are not forthcoming, then Prudential would not be under any obligation to complete the transaction and we would continue to operate the farm. * * *

What I am suggesting is that we develop a written agreement that will be satisfactory to the sellers and purchasers with the one contingency being the fact that Prudential must have funding for this program at a time within the sole discretion of Prudential.

Westmoreland rejected the purchase procedure outlined in David's letter, but emphasized that Prudential would, "if and when monies for purchases becomes [sic] available, give this case our first priority." Westmoreland also informed Kaneaster that he could not be sure when Prudential would return to the market, but he thought it would be within the next 120 days. As Kaneaster told David when relating this conversation, however, Westmoreland "made it very clear that there could be no assurances of that." At the end of February, the brothers were told that Westmoreland's supervisor remained very pessimistic about the availability of any funds for the joint venture in 1982 or in the early part of 1983.

The Hodges brothers then attempted to find other buyers for their farmland. Land values took a dramatic plunge during the several months that the Hodges brothers had the farm off the market, however, and the brothers were unable to find a buyer willing to purchase such a large tract of land.

David Hodges Farms brought this action for breach of contract, deceit, and negligent misrepresentation. After completion of Hodges Farms' case, the district court granted Prudential's motion for a directed verdict. This appeal followed.

## II. DISCUSSION

We review the district court's grant of Prudential's motion for a directed verdict under the same standards that the district court should have applied. Therefore, we view all evidence in the light most favorable to Hodges Farms, the non-moving party, and give Hodges Farms the benefit of all reasonable inferences. *See Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1218 (8th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

### A. Breach of Contract

Hodges Farms contends that Prudential contracted to purchase Hodges Farms' interest in Labelle, with Prudential's duty to perform conditioned only by its ability to obtain funding for the purchase. Hodges Farms asserts that it introduced sufficient evidence at trial to support a jury finding that Prudential breached its contract by failing to make reasonable good faith efforts to obtain funds with which to purchase Labelle.

We disagree. The evidence submitted at trial did not establish the most essential element of Hodges Farms' cause of action for breach of contract—the existence of a valid enforceable contract. Instead, the evidence unambiguously established that no contract for the purchase of Hodges Farms' interest in Labelle would or could be formed until Prudential's investment committee approved the proposed joint venture with Kaneaster. Because the investment committee never approved the joint venture, the condition precedent to the formation of the contract with Hodges Farms was never fulfilled and no liability can attach to Prudential for breach of contract. *See Wilson v. Scott,* 672 S.W.2d 782, 786 (Tenn.App.1984); *Real Estate Management v. Giles,* 41 Tenn.App. 347, 293 S.W.2d 596, 599 (1956).[2] *See also* E.

2. The district court concluded that Tennessee law controls this suit, and Prudential agrees. Hodges Farms contends that no clear answer exists as to which law applies, and identifies Tennessee, Mississippi, and Arkansas law as possibly controlling.

Our review shows that the law of these jurisdictions does not differ in any respect relevant to this appeal. Indeed, counsel for Hodges Farms conceded this point during oral argument. Because the district court would have reached the same result applying Tennessee, Mississippi, or Arkansas law, we need not reach

Allen Farnsworth, Contracts § 3.13 at 137–38 (1982). The district court therefore did not err in directing a verdict against Hodges Farms on its action for breach of contract.

### B. Deceit and Negligent Misrepresentation

Hodges Farms argues that the trial evidence showed that Westmoreland withheld vital information and made false statements material to the proposed joint venture and land sale, thereby causing Hodges Farms to take its interest in Labelle off the market for several months. In support of this proposition, Hodges Farms relies heavily on an affidavit prepared by Westmoreland's supervisor, Mark Wilkinson. In this affidavit, Wilkinson describes his response to Westmoreland's report summarizing thirteen projects being negotiated by Westmoreland and his staff:

> Late in October, 1981, I was advised by Westmoreland that a proposal for a joint venture was being prepared by his staff for review by the Real Estate Investment Department and possible submission to the Finance Committee of Prudential's Board. I advised Westmoreland that we were looking at more deals than we could handle and that he should advise Hodges that I could not recommend the proposed deal at the time.

Hodges Farms contends that Westmoreland never informed David and Kaneaster that Wilkinson could not recommend the joint venture. Instead, it asserts, Westmoreland affirmatively encouraged the Hodges brothers to believe that it was only a matter of time before Prudential's investment committee approved the project. Hodges Farms argues that it detrimentally relied on these false representations by removing Labelle Plantation from the market from November 1981 to March 1982, during which time land values fell drastically. Hodges Farms contends that it thus submitted sufficient evidence for the jury to find Prudential liable for deceit or negli-

the issue of whether the district court incorrect-

gent misrepresentation based upon Westmoreland's actions and inactions.

■ Both theories advanced by Hodges Farms require proof that Westmoreland made, by action or inaction, false representations on which Hodges Farms reasonably relied to its detriment. *Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240, 242 (Tenn.1972) (elements of an action for negligent misrepresentation); *Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780, 782 (1970) (elements of an action for deceit); *see also Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 588 (Tenn.App.1980); *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 232 (Tenn. App.1976). Hodges Farms completely failed to introduce such proof during the presentation of its case. The record reveals that David and Kaneaster Hodges were fully aware that a substantial number of projects were being developed for Prudential's consideration, and that Prudential could accept or reject any of them. Moreover, Westmoreland made frequent efforts to keep the Hodges brothers informed as to the status of the joint venture and the Labelle sale. Indeed, at the time that Kaneaster and Hodges Farms took Labelle off the market, they knew that Prudential was not currently considering new projects.

■ The mere expressions of optimism by Westmoreland that Prudential might eventually be interested in the joint venture and land sale cannot form the basis of an action for deceit and misrepresentation. *See Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585 (Tenn.App.1980) (mere opinion or conjecture as to future events is not actionable). The record indicates that David Hodges knew, when negotiating on behalf of Hodges Farms, that Westmoreland did not have the power, acting alone, to bind Prudential. *Compare Mahoney v. Delaware McDonald's Corp.*, 770 F.2d 123 (8th Cir.1985) (McDonald's bound by agent's assertion to third party that agent could execute a lease binding on McDonald's, and that approval by McDonald's land office constituted mere formality).

ly concluded that Tennessee law applied.

In light of the absence of any evidence showing deceit or misrepresentation on the part of Prudential or its agents, the district court properly directed a verdict against Hodges Farms on those causes of action. Kaneaster and Hodges Farms gambled, and unfortunately lost, when they removed Labelle Plantation from the market in the hopes that Prudential would approve the joint venture and the Labelle purchase. Hodges Farms had no obligation to take Labelle Plantation off the market, nor any assurance that Prudential would approve the project. The mere negotiations present here cannot establish any action for deceit or negligent misrepresentation.

## III. CONCLUSION

For the reasons discussed above, we affirm the district court's entry of a judgment dismissing the action of David Hodges Farms, Inc., against Prudential Insurance Company.